## BLANTON v. UNITED STATES.

## CHINN v. SAME.

### (Circuit Court of Appeals, Eighth Circuit. March 16, 1914.)

### Nos. 3945, 3946.

1. POST OFFICE (§ 48*)—OFFENSES AGAINST POSTAL LAWS—INDICTMENT—SUF-FICIENCY.

An indictment charging a scheme by which defendants, well knowing the requisites of a valid and vendible soldier's additional homestead entry right, should make or procure false and fraudulent affidavits and assignments, and then, representing the statements therein to be true, offer them for sale and sell them as valid with a guaranty which they did not intend to fulfill of their validity and that if they proved defective they would refund the money paid, replace the papers with others, or furnish further proofs, and which further negatived the validity of such pretended rights and evidences and the truthfulness of the statements and representations and charged that it was all done to secure money from persons named and the general public without giving or intending to give anything of equivalent value or to refund the money or replace the worthless papers with genuine ones, and that, in the execution of such scheme, they mailed a letter in a post office, signed by one of the defendants and addressed to a person named, a copy of which was set forth, sufficiently charged a use of the mails in aid of a scheme to defraud or obtain money by false pretenses in violation of Pen. Code, § 215 (Act March 4, 1909, c. 321, 35 Stat. 1130 [U. S. Comp. St. Supp. 1911, p. 1653]).

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 67–80; Dec. Dig. § 48.*]

2. POST OFFICE (§ 35*)—OFFENSES AGAINST POSTAL LAWS—USE OF MAILS TO DEFRAUD—SOLDIER'S SCRIPT—"SCHEME TO DEFRAUD."

A scheme to sell false and worthless instruments appearing on their face to be genuine "soldier's script" or the paper evidences of soldiers' additional homestead entry rights, consisting of an affidavit as to the right and an assignment thereof, with a copy of the soldier's discharge, in which a large traffic has grown up, is a scheme to defraud or obtain money by fraudulent pretenses within Pen. Code, § 215 (Act March 4, 1909, c. 321, 35 Stat. 1130 [U. S. Comp. St. Supp. 1911, p. 1653]), prohibiting the use of the mails in aid of such schemes, notwithstanding the lack of official origin of such script or that false swearing would not constitute perjury, since, though the rights to which they relate come from the government and the government officials make their own investigations when they are attempted to be exercised, such affidavits and assignments have a value in lawful private traffic according to customary accepted standards.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. § 35.*]

3. CRIMINAL LAW (§ 423*)—EVIDENCE—ACTS OF CONSPIRATORS.

On a trial for using the mails in aid of a scheme to defraud by selling false and worthless instruments as genuine soldier's script, where, though it appeared that those jointly indicted pretended to act independently, one of them conducting the correspondence with old soldiers, a second procuring from them or their widows false affidavits and assignments, and a third pretending to purchase the instruments so obtained and resell them, the evidence justified the jury in believing that there was a general scheme to defraud in which all took part and that the effort to make their acts appear independent was a pretense, the evidence as to what each did was properly admitted, though no conspiracy was charged, as a joint scheme to defraud, with acts to effectuate it, has the features of a conspiracy.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 989–1001; Dec. Dig. § 423.*]

4. POST OFFICE (§ 35*)—OFFENSES AGAINST POSTAL LAWS—USE OF MAILS TO DEFRAUD.

Where defendants, engaged in a scheme to defraud by selling worthless instruments as genuine soldier's script, also bought and sold valid script, the depositing in the mail of a letter advertising the business and soliciting correspondence on the subject without describing any particular homestead right violated Pen. Code, § 215 (Act March 4, 1909, c. 321, 35 Stat. 1130 [U. S. Comp. St. Supp. 1911, p. 1653]), forbidding the use of the mails in aid of schemes to defraud, though it did not appear that the script afterwards sold to the addressee was fraudulent.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. § 35.*

Nonmailable matter, see notes to Timmons v. United States, 30 C. C. A. 79; McCarthy v. United States, 110 C. C. A. 548.]

5. CRIMINAL LAW (§ 761*)—INSTRUCTIONS—ASSUMPTION OF FACTS.

It was proper to refuse instructions which recited as facts matters that were in issue.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1731, 1738, 1754–1764, 1771, 1853; Dec. Dig. § 761.*]

6. CRIMINAL LAW (§ 829*)—INSTRUCTIONS COVERED BY THOSE GIVEN.

It was proper to refuse instructions stating legal principles which were embodied in the general charge.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2011; Dec. Dig. § 829.*]

7. CRIMINAL LAW (§ 814*)—INSTRUCTIONS—ASSUMPTION OF FACTS.

An instruction on circumstantial evidence, which proceeded on the erroneous assumption that the evidence against defendants was entirely circumstantial, was properly refused.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1821, 1833, 1839, 1860, 1865, 1883, 1890, 1924, 1979–1985, 1987; Dec. Dig. § 814.*]

8. CRIMINAL LAW (§ 784*)—INSTRUCTIONS—WEIGHT OF EVIDENCE.

Where the evidence against defendants was not entirely circumstantial, an instruction as to the strength of such evidence essential for a conviction, and that it should always be cautiously considered, was properly refused, as it is not proper to instruct the jury upon the insufficiency of a part only of the testimony.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1883–1888, 1922, 1960; Dec. Dig. § 784.*]

9. CRIMINAL LAW (§ 830*)—INSTRUCTIONS—MODIFICATION.

A requested instruction was properly refused unless it ought to have been given in the very terms in which it was proposed.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2012, 2017; Dec. Dig. § 830.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
213 F.—21

10. CRIMINAL LAW (§ 809*)—INSTRUCTIONS—MISLEADING INSTRUCTIONS.

An instruction which would tend to mislead the jury was properly refused.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1961–1967; Dec. Dig. § 809.*]

In Error to the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

W. E. Blanton and W. W. Chinn were convicted of using the mails in aid of a scheme to defraud, and they separately bring error. Affirmed.

Thomas M. Seawel, of Springfield, Mo. (Oscar T. Hamlin, of Springfield, Mo., on the brief), for plaintiffs in error.

Thad B. Landon and Leslie J. Lyons, both of Kansas City, Mo. (Hugh C. Smith, of Kansas City, Mo., on the brief), for the United States.

Before HOOK and SMITH, Circuit Judges, and AMIDON, District Judge.

HOOK, Circuit Judge. W. E. Blanton, W. W. Chinn, Thomas A. Wakefield, and T. A. Wakefield, Jr., were jointly indicted for using the mails in aid of a scheme to defraud and to obtain money by false and fraudulent pretenses contrary to section 215 of the Penal Code. The Wakefields pleaded guilty. Blanton and Chinn were tried, convicted, and sentenced, and they separately prosecuted these writs of error. Another party who was discharged at the trial is excluded from the list of defendants. The assignments of error which merit notice may be grouped according to the general subjects to which they relate, as follows: (1) The sufficiency of the fourth count of the indictment upon which alone conviction resulted; (2) the sufficiency of the evidence to convict; (3) the admission of evidence; and (4) the refusal of instructions.

The fraudulent scheme charged, in the execution of which the mails were used, related to the sale of so-called "soldiers' additional homestead entry rights." Section 2304, Rev. Stat. (U. S. Comp. St. 1901, p. 1413), provides that soldiers who had served for 90 days in the army of the United States during the Rebellion and were honorably discharged and remained loyal should be allowed to enter 160 acres of land under the homestead act. Exceptional, favorable terms and conditions are granted by section 2305. Section 2306 (page 1415) provides that every person entitled under section 2304 who may have "heretofore" entered under the homestead laws less than 160 acres shall be permitted to enter an additional quantity not exceeding altogether the original maximum. Section 2307 extends the right to the widow of the soldier and in case of her death or remarriage then to his minor children. The statute was embraced in the revision of June 22, 1874, and speaks as of that date. It was construed as granting a bounty or gift, assignable or vendible by the beneficiaries, and as not requiring their personal residence upon the public land selected and entered. Webster v. Luther, 163 U. S. 331,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

16 Sup. Ct. 963, 41 L. Ed. 179. The rights being assignable, a large traffic in them grew up, or rather in the paper evidences consisting of an affidavit of the soldier or his widow or children as the case might be, showing identity and the existence of the statutory conditions, an assignment of the right often executed in blank, and a copy of the soldier's discharge. Though these instruments did not originate with the officers of the government and were not expressly prescribed by the statute, they came to be generally regarded by the public as the evidence of the additional entry right and the ownership of such right by the assignee or holder. They were, inaccurately, called "soldiers' script" and became a common subject of barter and sale.

[1, 2] The scheme to defraud charged in the fourth count of the indictment was substantially that defendants, well knowing the requisites of a valid and vendible soldier's additional homestead entry right, should make or procure affidavits and assignments in which the statutory conditions were falsely and fraudulently stated to exist, and then, representing the statements contained were true, offer them for sale and sell them to the public as valid with a guaranty which they did not intend to fulfill of the validity of the rights sold, and that if they proved defective for any cause they would upon the return of the papers refund the money paid or replace the papers with others calling for an equal quantity of land or would furnish further proofs if required. The validity of the pretended rights and evidences and the truthfulness of the statements and representations were negatived, and it was charged that it was all to be done by defendants to secure money from certain persons named and the general public without giving or intending to give anything of equivalent value or to refund the money paid or replace the worthless papers with others that were genuine. This was stated with much elaboration and detail. It was also charged that in the execution of the scheme the defendants mailed a letter in the post office at Springfield, Mo., dated April 11, 1910, signed T. A. Wakefield, and addressed to C. A. Moore, Baker City, Or.; a copy being set forth. We think the count of the indictment fully sufficient and that it is not subject to any of the criticisms made. It contains all the essentials of description of the fraudulent scheme required in such cases and a direct charge of the substantive offense. Brooks v. United States, 76 C. C. A. 581, 146 Fed. 223; Lemon v. United States, 90 C. C. A. 617, 164 Fed. 953. An argument is made on the peculiar character of the evidence of the additional rights or so-called "soldier's script." Such instruments being fair on their face and having a recognized value in the market on the faith of their genuineness and the truth of their recitals, but being in fact false and worthless, could well be the medium of a scheme to defraud or of obtaining money by fraudulent pretenses, notwithstanding their lack of official origin or that false swearing would not constitute perjury. Though the rights to which they relate come from the government, and the government officials make their own investigations when they are attempted to be exercised, yet the affidavits and assignments have a value arising in the course of lawful private traffic. It is a value according to customary, accepted standards in har-

mony with the law, and a false, assertion of verity, and worth when neither exists may be used as an efficient means of defrauding. The essence of the scheme charged consisted in obtaining money from the public for instruments which were not what they purported and were represented to be nor what purchasers were led to believe by promises of defendants which they did not intend to fulfill.

[3, 4] It is contended that the evidence was insufficient for conviction, that the defendants were independent dealers each acting for himself alone as vendor or vendee, and that since no conspiracy was charged and no such concert of action was proved as would make the acts of one admissible against another each should be judged solely by his own conduct. The defendants were charged jointly and the instructions of the trial court accurately expressed the necessity of proof of joint participation. The court further said:

"It is not necessary that they shall all have the same function to perform in the carrying out of the scheme; but simply that they knowingly and intentionally combined and participated in the scheme as a whole, each one doing his part to the accomplishment of it, a larger part or a minor part, it may be, but nevertheless a substantial part at some time and in some form in the progress of the scheme to carry it out."

The evidence of what each one did was properly laid before the jury (Fizpatrick v. United States, 178 U. S. 304, 20 Sup. Ct. 944, 44 L. Ed. 1078), and under the guidance of the instructions the jury found all were participants in a scheme to defraud. We think the verdict was supported by substantial evidence. It is true that all the script they bought and sold was not fraudulent, nor did all the defendants have an interest in every transaction, but there was a substantial part of their business wholly fraudulent in which all defendants participated, showing an association in a continuous course of dishonest conduct, and, as regards the ultimate purchasers, an indifference whether the thing sold was good or bad. In a case typical of this class a veteran of the Civil War who had a name like or similar to that of a homestead entryman who according to the government records had entered less than 160 acres of land prior to June 22, 1874, would be approached first by correspondence and then personally, and an affidavit would be obtained from him falsely reciting his identity with the entryman and also an assignment of his pretended right of additional entry. Ordinarily this was not difficult to do because of the advanced age of those dealt with; but sometimes to overcome obstacles interpolations were made in the papers after they were signed and delivered and without the authority of the signers. Blanton, who had lists of names and abstracts from official records from which he got the names of original entrymen and of the old soldiers, generally conducted the preliminary correspondence, Chinn the negotiations with the old soldiers or their widows, and T. A. Wakefield the sales of the "script" obtained. The papers were transmitted by Wakefield to the purchasers through a bank with which all the defendants did business; the bank received the proceeds and then disbursed them according to previous directions. The disbursements regarded by themselves indicated a sale from one defendant to another; but, as we have said, the evidence justified the jury in be-

lieving that in a larger and true sense there was a general scheme to defraud in which all took part. Wakefield, who pretended to buy from Blanton, did not pay until he got the money from his purchasers. The portion of each, and Chinn's also, came from the proceeds of the sale. If Wakefield made no sale, there was no money to distribute. Wakefield guaranteed the purchasers that if the papers proved void he would upon their return to him refund the money paid or replace the papers with others calling for an equal number of acres of land. The guaranty was specious but worthless. When a purchaser sought to locate the "script" on public land, he delivered the papers to the government officials, their investigation disclosed the fraud, but they retained the papers, and a return of them to Wakefield could not be made. There was also a promise of additional proof, if required; but it was obviously valueless where the very foundation of the claim was false.

Complaints of the purchasers were met by promises which yielded nothing. They were put off on one pretext or another, but lost their money. There were so many cases in this class of fraudulent, worthless papers, so much money taken for them from innocent purchasers, and so many fruitless complaints from purchasers that with the other evidence the jury were justified in believing there was a prepared course of action designed to defraud and not a number of separate, isolated transactions each to be judged solely by itself; also, that the effort to make what each defendant did appear independent of the conduct of the others was a pretense. The letter charged in the fourth count to have been deposited in the mails did not by its terms describe any particular homestead right, nor did the evidence show that the "script" Wakefield afterwards sold Moore, the addressee, was fraudulent, or that Blanton and Chinn were interested in it, still by heading and text it advertised the business in which Wakefield was engaged and generally solicited correspondence on the subject. In their joint and fraudulent venture Wakefield was the salesman, and whatever advertised or aided him was for the benefit of all. They were working together, and they mixed their business good and bad. They made no distinction in this particular among themselves or towards those they solicited to purchase, and the use of the mails to exploit or advertise the business was to effectuate that which was unlawful as well as that which was not. When the letter was put in the mails, their fraudulent course of business was still afoot; it had begun and had not been concluded or abandoned. The complaints of the admission of evidence, so far as properly assigned as error, are answered by what has been said. See, also, St. Clair v. United States, 154 U. S. 134, 149, 14 Sup. Ct. 1002, 38 L. Ed. 936; Sprinkle v. United States, 73 C. C. A. 285, 141 Fed. 811. A joint scheme to defraud with acts to effectuate it has the features of a conspiracy.

[5-10] The remaining assignments of error are for denials of special requests for instructions. Some recite as facts matters that were in issue and some erroneous propositions of law. Where they were right in form and substance, the legal principles were embodied in the general charge of the court to which no exception was taken. The most

serious complaint is of the denial of a request respecting circumstantial evidence which was not correctly covered by the general charge. We think, however, the denial was right. After the first few words, the request proceeds on the erroneous assumption that the evidence against the accused was entirely circumstantial, speaks of the strength of such evidence essential for conviction, and says it should always be cautiously considered. A requested instruction is properly refused unless it ought to have been given in the very terms in which it is proposed. Brooks v. Marbury, 11 Wheat. 78, 6 L. Ed. 423. An instruction as to evidence which would have a tendency to divert the minds of the jury from the controlling effect which other proper evidence may have on their decision should be refused. Ayers v. Watson, 113 U. S. 594, 606, 11 Sup. Ct. 201, 34 L. Ed. 803. A court may properly decline to give an instruction which would tend to mislead the jury. Agnew v. United States, 165 U. S. 36, 51–52, 17 Sup. Ct. 235, 41 L. Ed. 624. A request to instruct the jury upon the insufficiency of a part only of the testimony is objectionable. Smith v. Condry, 1 How. 28, 11 L. Ed. 35. The record discloses no reversible error.

The judgment is affirmed.