CHAMBERS v. UNITED STATES.

RUSSELL v. SAME.

(Circuit Court of Appeals, Eighth Circuit. October 30, 1916.)

Nos. 4599, 4600.

1. CRIMINAL LAW ☞747—TRIAL—JURY QUESTION.
Where the evidence on an issue is conflicting, the question is for the jury.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1714, 1727; Dec. Dig. ☞747.]

2. CRIMINAL LAW ☞1159(2)—APPEAL—CONVICTIONS—EVIDENCE.
Where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of the appellate court to reverse a conviction; but the rule does not apply where there was any substantial evidence inconsistent with the innocence of accused.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3075, 3082, 3083; Dec. Dig. ☞1159(2).]

3. POST OFFICE ☞49—OFFENSES—EVIDENCE—SUFFICIENCY.
In a prosecution for devising a scheme, and using the mails in connection with a scheme, to defraud by deceiving purchasers as to the character of lands for sale, evidence *held* sufficient to support a conviction; all the substantial evidence not being as consistent with innocence as with guilt.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ☞49.]

4. CRIMINAL LAW ☞633(1)—TRIAL—CONDUCT OF TRIAL.
It is the province of the jury in actions at law to try and determine the rights of the parties according to the law and the evidence, and it is the duty of the court and its officers and counsel of the parties to prevent the jury from the consideration of extraneous issues, so as to guard it against the influence of passion and prejudice, and to secure to litigants a fair and impartial trial.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1450, 1451, 1453, 1459; Dec. Dig. ☞633(1).]

5. CRIMINAL LAW ☞1037(1), 1055—TRIAL—APPEAL—OBJECTIONS.
An objection to unfair remarks of counsel, calling the attention of the judge to them when made, together with an exception to the action of the judge, or his lack of action, on the objection, are essential to a review of the unfair remarks, or their effect.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2645, 2666, 2667; Dec. Dig. ☞1037(1), 1055.]

6. CRIMINAL LAW ☞723(1)—ARGUMENT OF COUNSEL.
In a prosecution for devising the scheme, and for using the mails in connection with a scheme, to defraud in sale of land, where it clearly appeared that the land received by the purchasers was not of the value represented, reference to them as victims in the argument of the prosecutor was not error.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1663, 1674, 1676; Dec. Dig. ☞723(1).]

7. CRIMINAL LAW ☞956(11)—TRIAL—EVIDENCE.
Where accused moved for new trial on the ground that the deputy mashal had answered queries of the jurors during their deliberations, questions whether the statements of the deputy marshal were made before the jury had agreed on a conviction, and whether such statements

were prejudicial, were questions of fact, on which it was proper for the court to receive evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2387–2389; Dec. Dig. ☜956(11).]

8. CRIMINAL LAW ☜1156(5)—APPEAL—DISCRETION OF COURT.

Where there was substantial evidence that statements made by the deputy marshal to the jury before they returned their verdict were not prejudicial, and were made after they had agreed upon conviction, the denial of a motion for new trial on such ground cannot be reviewed, as the granting or refusing of a motion for new trial is discretionary with the lower court.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3071; Dec. Dig. ☜1156(5).]

9. CRIMINAL LAW ☜956(11)—TRIAL—CONDUCT OF JURY.

Before the jury had returned their verdict in a prosecution for devising a scheme, and using the mails in connection with a scheme, to defraud, they called in the deputy marshal, and in answer to their questions he stated that the lowest penalty that would be inflicted was a fine of $1, or $10, or probably $25, and that, when the jury recommended defendants to the mercy of the court, the court generally followed the recommendation. Held, that the statements raised only a rebuttable presumption that they were prejudicial, and so, where there was competent evidence to show that the statements were made after the jury had determined on conviction, and that they were not prejudicial, it is properly received in disposing of a motion for new trial on the ground of such statements.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2387–2389; Dec. Dig. ☜956(11).]

10. POST OFFICE ☜35—OFFENSES—SCHEME TO DEFRAUD.

In a prosecution for devising a scheme, and using the mails in connection with a scheme, to defraud in disposing of land by means of false representations, where many false representations as to the character of the land were relied on, it is no defense that the evidence failed to show that defendants intended to defraud the purchasers by failing to give them land which was worth the price they agreed to pay.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. ☜35.]

11. CRIMINAL LAW ☜829(13)—TRIAL—INSTRUCTIONS.

In a prosecution for devising a scheme, and using the mails in connection with a scheme, to defraud, where the indictment, setting forth the false representations by means of which defendants effected sales of land, was read to the jury, and the evidence concerning the representations was most voluminous, a request to charge that the jury could not consider the testimony of any witness to the promise of defendants to return the purchase money, except as to the light it might throw on the intent of defendants, or their good faith, was properly refused, though the indictment did not specify false representations as to the return of the purchase money; the court having charged the jury that only the representations contained in the indictment could be considered.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2011; Dec. Dig. ☜829(13).]

12. POST OFFICE ☜35—OFFENSES—USE OF MAILS IN CONNECTION WITH SCHEME TO DEFRAUD.

In a prosecution for devising a scheme to use the mails to defraud in the sale of lands, and using the mails in connection therewith, it is not essential to a conviction that the false representations made to prospective purchasers amounted actually to a substantial deception.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. ☜35.]

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

13. **POST OFFICE ⬤══50—OFFENSES—USE OF MAILS IN CONNECTION WITH SCHEME TO DEFRAUD.**

In a prosecution for devising a scheme, and using the mails in connection with a scheme devised, to defraud by disposing of lands by misrepresentations, where it appeared that many of the representations as to facts concerning the land were untrue, a requested instruction that men engaged in the business of selling land are not criminally liable for puffing their wares, so long as their statements are within any proper reasonable bounds, and that a certain degree of commendation of the lands was not criminal, so long as the statements were not actually made in bad faith and with an intent to deceive, was properly refused, being without qualification.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 87–89; Dec. Dig. ⬤══50.]

14. **CRIMINAL LAW ⬤══829(1)—TRIAL—REFUSAL.**

The refusal of requested instructions, covered by the charge given, is not error.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2011; Dec. Dig. ⬤══829(1).]

15. **POST OFFICE ⬤══35—OFFENSES—SCHEME TO DEFRAUD.**

Where several devised a scheme to defraud, intending to execute it by means of correspondence through the mails, and, pursuant to the scheme, one of the several defendants prepared and mailed letters intended to carry out the scheme, the others are bound by his acts, being partners in his criminal intent.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. ⬤══35.]

16. **POST OFFICE ⬤══49—OFFENSES—EVIDENCE—SUFFICIENCY.**

In a prosecution for devising the scheme, and using the mails in connection with the scheme, to defraud, evidence *held* to show that one of the defendants, who did not actually use the mails, was a party to the criminal intent of his codefendant in using the mails.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ⬤══49.]

17. **POST OFFICE ⬤══49—OFFENSES—USE OF MAILS IN CONNECTION WITH SCHEME TO DEFRAUD—EVIDENCE—SUFFICIENCY.**

In a prosecution for devising scheme, and using the mails in connection with a scheme, intended to defraud, evidence *held* insufficient to show that one of those convicted with the principal defendants, and who moved for a new trial, was connected with the scheme or use of the mails.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. §§ 84–86; Dec. Dig. ⬤══49.]

In Error to the District Court of the United States for the Western District of Missouri; John C. Pollock, Judge.

Edward C. Chambers and Ernest L. Russell were convicted of devising a scheme to defraud and intending to carry it out by using the mails, and they severally bring error. Affirmed.

R. R. Brewster, of Kansas City, Mo. (Paul R. Stinson, Brewster, Kelly, Brewster & Buchholz, and E. H. Busiek, all of Kansas City, Mo., on the brief), for plaintiffs in error.

S. R. Rush, Sp. Asst. Atty. Gen. (Francis M. Wilson, U. S. Atty., and William G. Lynch, Asst. U. S. Atty., both of Kansas City, Mo., on the brief), for the United States.

⬤══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before SANBORN and CARLAND, Circuit Judges, and TRIE-
BER, District Judge.

SANBORN, Circuit Judge. Edward C. Chambers and Ernest L.
Russell were indicted for devising a scheme to defraud, intending to
execute it by means of correspondence through the post office depart-
ment of the United States, and for executing that scheme by means
of such correspondence through that department. They were tried,
convicted, and sentenced, and these writs of error were sued out to
challenge the legality of the proceedings at the trial.

The scheme alleged was to sell small tracts of land of from 10
to 80 acres each, which were under water and incapable of cultiva-
tion, to each of many intending occupiers and cultivators, for $65
an acre, in installments of $1 an acre per month, by means of false
representations as to the character, fertility, and value of the land,
and as to its availability for profitable farming operations, and for
occupation by comfortable homes. The scheme was devised and exe-
cuted between January 8, 1909, and July, 1913. In December, 1910,
Chambers made a contract to buy of the state of Florida on the in-
stallment plan 50,000 acres of land for the price of $15 an acre. He,
his agent Russell, and his other agents, proceeded by representations
and statements to sell this land to purchasers for $65 an acre, payable
in installments of $1 an acre a month. The land he bought and sold
was situated in the Everglades of Florida southeast of Lake Okeecho-
bee, between that lake and the ocean. The distance from the lake to
the ocean through or around these lands is about 50 or 60 miles. The
land from time immemorial has been, and with the exception of
comparatively small tracts, contiguous to or within half a mile or a
mile of one of the canals that have been dug by the state since 1908,
still is, under water to a depth of from three inches to several feet,
so that very much of the larger part of the tracts sold to purchasers
has always been, and still is, incapable of occupation and use for farm-
ing purposes. The lake is a few feet higher than the ocean, the land
slopes from the lake to the ocean, with a fall of from two to three
inches to the mile, and the water upon it is inclosed by a rock rim,
which reaches around it near the shore. Its access to the ocean is
through a few gaps existing or made in this rim. Lake Okeechobee
receives water from a watershed to the north and west of it 7½ times
its area, and one of the engineers testified that it was the largest
fresh-water lake wholly within the United States. In this region the
annual rainfall is very large, from 20 to 80 inches, and the water
from the watershed north and west of the lake overflows it, spreads
over the land to the glades southeast of it, where Chambers' 50,000
acres are, and generally keeps it under water. In addition to the
water from the watershed northwest of the lake, there is a very large
precipitation upon the land itself.

Two or three years before Chambers made his contract of pur-
chase the Florida Fruit Lands Company and the state of Florida
conceived a scheme and entered upon the execution of it for the
state to sell some of this land and to expend the proceeds of the sale
in draining it. Accordingly the state sold 184,000 acres to the Fruit

Lands Company for $2 an acre, made a contract with a construction company to dig four ditches about 6 miles apart through this 184,000 acres and through or near Chambers' land from the ocean to or toward Lake Okeechobee, a distance of 50 or 60 miles. Chambers was one of the agents of the Fruit Lands Company to sell its land. The land of the Fruit Lands Company was successfully sold by the end of the year 1910. In December, 1910, Chambers purchased his 50,000 acres and paid $50,000 in cash, his first installment of the purchase price. At that time the construction company had commenced at the ocean and was digging the ditches northwesterly towards the lake and Chambers' land under a contract to complete them by July, 1913. Chambers and his agents, in their endeavors to sell the land to residents in the country surrounding Kansas City, where his general office was located, made many persuasive representations, such as that the reclamation of the Everglades was assured, that oranges, grape fruit, lemons, limes, avocadoes, pawpaws, persimmons, mulberries, figs, guavas, beans, cabbages, tomatoes celery eggplant, bananas, the plantain, sugar cane, cotton, tobacco, rice coffee, hemp, flax, Indian corn, barley, hops, buckwheat, cassava, pineapples, strawberries, watermelons, cantaloupes, peaches, pears, citrons, squash, okra, peas, cucumbers, cauliflower, lettuce, onions, sweet and white potatoes, and peanuts could be raised on Chambers' land when it was drained, and that it would be drained and ready for cultivation and occupation by October, 1912, or October, 1913; that the soil was black muck; that it was the richest soil in the United States, being worth over $6 a ton as a fertilizer; that no fertilizer was required to raise good crops upon it; that parties cultivating such soil cleared $300 to $800 an acre growing garden truck, while their grape fruit and orange groves were coming into bearing; that on December 26, 1912, Chambers' company had enough farmers on his land to demonstrate to the people of the United States what could be done on Everglade land. There was substantial evidence that these representations and others were made, and that these were false; but the testimony was conflicting, and there was substantial evidence that some of these representations were true. Each of the defendants testified that he believed them to be true when they were made, and that he never had any intention or purpose to deceive or mislead the purchasers, and the defendants produced persuasive evidence in support of their testimony. At the close of all the evidence each of the defendants requested the court to instruct the jury to return a verdict in his favor, and the refusal of the court to give this instruction is the first alleged error urged upon our consideration.

[1] It is not claimed that there was not substantial evidence that the alleged representations which have been recited were made, and that they were false, although it is insisted that the weight of the evidence was that they were true, so that it is practically conceded that the question whether or not these representations were made by means of the mails to their purchasers by the defendants, and whether or not they were true, were questions for the jury, and not for the court, and these questions are here dismissed.

[2, 3] But counsel for the defendants invoke the established rule that, where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of the appellate court to reverse a judgment of conviction (Harrison v. United States, 119 C. C. A. 78, 200 Fed. 662; Isbell v. United States, 142 C. C. A. 312, 317, 227 Fed. 788, 793), and they insist that there was no substantial evidence of any facts inconsistent with the innocence of the defendants of knowledge of the falsity of any of their material representations, or with their innocence. of any intention to deceive or defraud the purchasers from them.

"The rule is that, where all the substantial evidence was as consistent with innocence as with guilt, it is the duty of the appellate court to reverse the judgment against the defendant—not where there was a preponderance of the substantial evidence, or witnesses of the greater credibility in favor of his innocence, but where there was no substantial evidence, no substantial testimony nor credible witness whatever, of any facts inconsistent with the innocence of the accused. This is the only question the court is required or permitted to determine under this rule, and where there was any substantial evidence inconsistent with the innocence of the accused, although it may have been contradicted, * * * the weight of the evidence, the credibility of the witnesses, and the guilt or innocence of the defendant are left to the determination of the jury." Isbell v. United States, 142 C. C. A. 312, 317, 227 Fed. 788, 793.

The question here, therefore, is whether or not there was any substantial evidence in this case of facts which were more consistent with the intention of the defendants to deceive and defraud the purchasers than with their innocence of that intention. There is a vast mass—there are two large printed volumes—of evidence. There is neither time nor space to recite or review it. A perusal of it renders it certain that the defendants, and all who knew the land they sold, must have known that it was and would be worthless for farming or habitation unless it was thoroughly drained. The defendants knew that the canals under contract would be about six miles apart. There was substantial evidence, the testimony of one of the board that sold the land to Chambers, that at the time of the sale to him there was a conversation between the members of the board and Chambers, the effect of which was that the canals which the state was digging would be sufficient to drain the lands so far as the main arteries were concerned, but that the owners of the land would have to dig the subditches or laterals; that the state did not contemplate digging those. The distance between the canals, six miles, the saturated overflowed condition of the land, and the common knowledge of dealers in lands, render it difficult to believe that the defendants did not know, not only that these lands were neither tillable nor habitable in 1909, 1910, 1911, and 1912, but that none of them, except possibly those within a mile of the main canals, ever would be tillable or habitable until subditches or laterals were dug through the lands. One of the witnesses testified that the state contemplated the necessity of laterals, but did not contemplate digging them; that a system of laterals two miles apart would be necessary before the drainage of the lands, with the exception of those immediately contiguous to the main canals, would be perfect; but no such system

of laterals had been adopted and no laterals were being dug while these lands were being sold, or have ever been dug, and the great bulk of the lands sold is still under water. Under these circumstances the representations which the defendants made that these lands would be tillable and habitable by the fall of 1912 or 1913, and the sale of them in five and ten acre tracts for farming and homes at $65 an acre, do not appear to us to be as consistent with the innocence as with the guilt of an intention on the part of each of these defendants to mislead and deceive the purchasers into buying, as they did, untillable and uninhabitable land covered with water for productive farming land.

There was substantial evidence that the soil in these lands, if drained, would not produce reasonably profitable crops and that it was practically without value for this purpose without the use of fertilizers. No credible testimony has been discovered in the record that any of this land was worth $6 a ton as a fertilizer. The representations made by the defendants that the soil was black muck and without doubt the richest in the United States, being worth over $6 a ton as a fertilizer, does not appear to our minds to be as consistent with innocence as with guilt of an intention on the part of each of these defendants to mislead and deceive the purchasers from them into buying as the most fertile and productive land the water-covered tracts, of no present and of doubtful future use for farming purposes, which the defendants sold them. There was substantial evidence at the trial below of other facts, which it is useless to recite, that tend to lead the mind to the same conclusion. It is true that there is much testimony and that there are many established facts in this case which tend to lead the mind in the opposite direction; but it is not permissible in this action at law, under the Constitution and laws of the United States, for this court to determine the weight of the evidence, or the fact as to the belief or intention of the defendants. Where the substantial evidence in a case of this character upon these issues is conflicting in itself and in its tendencies, it is the exclusive function of the jury to decide them. The jury have done so. They have found that each of the defendants intended to deceive and mislead the purchasers, and by material false representations to induce them to buy the land they purchased, in the belief that it was of a far different and better character, and of greater value, than it was in fact. A patient examination of the evidence has forced our minds to the conclusion that there was at the trial substantial evidence of facts more consistent with the guilt than with the innocence of each of these defendants of that intention, and that there was no error in the refusal of the court to instruct the jury to return a verdict in their favor.

[4-6] The second objection to the legality of the trial is that the arguments of the counsel for the United States to the jury were "highly inflammatory, unfair, and prejudicial." The rules of practice upon this subject have been repeatedly stated by this court. In Union Pacific R. Co. v. Field, 137 Fed. 14, 15, 16, 69 C. C. A. 536, 537, this court said:

"Under our system of jurisprudence it is the province of the jury in actions at law to try and determine the rights of parties according to the law and the evidence. It is the duty of the court and of its officers, the counsel of the parties, to prevent the jury from the consideration of extraneous issues, of irrelevant evidence, and of erroneous views of the law, to guard it against the influence of passion and prejudice, and to assure to the litigants a, fair and impartial trial. An omission by court or counsel to discharge this duty, or a persistent violation of it, is a fatal error, because it makes the trial unfair."

But an objection to unfair remarks of counsel to the jury, which sharply calls the attention of the presiding judge to them when they are made, and if he fails to extract the virus of them by withdrawing them from the jury if possible, or if impossible by discharging the jury and granting a new trial before another jury, and an exception to his action or lack of action, are essential to a review of the unfair remarks or of their effect in an appellate court. Cudahy Packing Co. v. Skoumal, 60 C. C. A. 306, 313, 125 Fed. 470, 477; Union Pacific R. Co. v. Field, 69 C. C. A. 536, 538, 137 Fed. 14, 16. The only objection made by counsel for the defendants to any part of the address of counsel for the United States was to his calling the purchasers of the lands from Chambers victims. That objection was overruled by the court and an exception was taken. But the purchasers certainly were victims of deleterious purchases and contracts, whether through the good or evil intent of the defendants, and it was not error to call them such.

[7, 8] The third complaint is that before the jury had found and returned their verdict, and while they were deliberating concerning it, they called the deputy marshal into their room and asked him what the lowest penalty was that would be inflicted, and he replied a fine of $1, or $10, or probably $25; that they then asked him what the court usually did when the jury recommended defendants to the mercy of the court, and he answered that it generally followed the direction of the jury. After the verdict was rendered the defendants made a motion for a new trial, on the ground that each of them was prejudiced by the statements of the deputy marshal to the jury before the verdict was rendered. Thereupon a trial of the issue tendered by this allegation was had. Seven jurors were called and testified regarding the statements of the deputy marshal, the time of their receipt, and the effect of them. Five of them testified that before the deputy marshal made his statements the jury had agreed that the defendants Chambers and Russell, who are now complaining, were guilty, and that the only question then at issue among them was whether or not two other defendants, who were indicted and tried with them, and who have not been sentenced, were likewise guilty. One of these seven jurors testified rather uncertainly that the jury had not agreed upon the guilt of any of the defendants when the statements were made, and the seventh juror did not testify upon this issue. The court below found that the issue of the guilt or innocence of the defendants Chambers and Russell had been determined by unanimous agreement of the jury before the statements of the deputy marshal were made, that those defendants were not prejudiced by the state-

ments, and that the motion for a new trial must be, and it was, denied. As the questions whether or not the statements of the deputy marshal were made before the jury had agreed upon the guilt of Chambers and Russell, and whether or not those statements were prejudicial to them, were questions of fact, which it was the province and duty of the court below to receive evidence regarding and to determine (Mattox v. United States, 146 U. S. 140, 147, 151, 13 Sup. Ct. 50, 36 L. Ed. 917), as there was not only substantial, but preponderating, evidence in support of its decision of them, and as the granting or refusing of a motion for a new trial is discretionary with the trial court, and his grant or refusal of it is not reviewable by the federal appellate court (Newcomb v. Wood, 97 U. S. 581, 24 L. Ed. 1085; Mattox v. United States, 146 U. S. 140, 150, 13 Sup. Ct. 50, 36 L. Ed. 917), there was no reversible error in the action of the court regarding the statements of the deputy marshal to the jury.

[9] Counsel contend, however, that in the receipt of the evidence and in the consideration and decision of the question whether or not the statements were prejudicial, the court below committed an error of law, because the fact that the statements were made and heard by the jury raised a conclusive legal presumption of prejudice which could not be rebutted by evidence; and they cite State v. Murphy, 17 N. D. 48, 115 N. W. 84, 88, 89, 17 L. R. A. (N. S.) 609, 16 Ann. Cas. 1133, Cooper v. State, 103 Ga. 63, 29 S. E. 439, 440, Cole v. Swan, 4 Iowa, 32, 33, People v. Knapp, 42 Mich. 267, 3 N. W. 927, 36 Am. Rep. 438, and Wilkerson v. State, 78 Miss. 356, 29 So. 170, in support of this contention. The opinions in these and other cases have been read and considered, and the conclusion is that the stronger reasons and the weight of authority sustain the rule that, where a motion for a new trial is made on account of communications to the jury during their deliberations, there is a rebuttable legal presumption that they were prejudicial to the moving party, that this presumption may in some cases be overcome by evidence, and that where competent evidence is offered it is the duty of the trial court to hear and consider it, and that when it does so, and decides the motion thereon, its decision is discretionary, and is reviewable by a federal appellate court for abuse of discretion only. Mattox v. United States, 146 U. S. 140, 149, 13 Sup. Ct. 50, 36 L. Ed. 917; Holmgren v. United States, 156 Fed. 439, 443, 445, 84 C. C. A. 301; Holmgren v. United States, 217 U. S. 509, 521, 522, 30 Sup. Ct. 588, 54 L. Ed. 861, 19 Ann. Cas. 778; Oborn v. State, 143 Wis. 249, 126 N. W. 737, 748, 31 L. R. A. (N. S.) 966; State v. Stark, 72 Mo. 37, 40; State v. Shipley, 171 Mo. 544, 550, 71 S. W. 1039; McFalls v. State, 66 Ark. 16, 22, 48 S. W. 492; State v. Whalen, 98 Iowa, 662, 672, 68 N. W. 554; Williams v. Chic. & N. W. Ry. Co., 11 S. D. 463, 78 N. W. 949, 950.

[10] It is specified as error that the trial court refused to give to the jury a requested instruction to the effect that, although they found that the defendants did not believe that the lands sold to the purchasers named in the indictment would be worth the amount stated in the literature, or that it had all the qualities as to fertility stated therein, or that it would be drained, reclaimed, and ready for cultivation with-

in the time stated therein, "still you cannot convict any of the defendants upon any count in the indictment, unless you further find and believe from the evidence that the defendants intended to defraud them by failing to give them land which was worth the price which they agreed to pay." The argument in support of this specification is that the United States alleged in the indictment that one of the false representations which the defendants intended, when they devised their scheme to defraud, to use, and which they did use, to effect it, was that the farms they offered to sell and sold were worth much more than the price they were offered for sale and were sold for, that there could have been no fraud on the purchasers unless the defendants sold them land of less value than the price at which they sold them, and that the defendants could not be lawfully adjudged guilty unless the jury found and believed that the defendants intended to defraud the purchasers by selling them land worth less than the purchase price they agreed to pay for it. This argument is unsound. It might be persuasive if the only misrepresentation alleged to have been devised and used to effect the scheme to defraud was that regarding the relation of value to price. But the representation in that regard was only one of more than a dozen misrepresentations alleged in the indictment. Indeed, the indictment would have charged the offense if the averment of this misrepresentation had been entirely omitted, and the Supreme Court has expressly so decided. United States v. New South Farm and Home Company, 241 U. S. 64, 36 Sup. Ct. 505, 60 L. Ed. 890, filed April 24, 1916. If, therefore, the jury found that the defendants devised and executed a scheme to use the other misrepresentations alleged in the indictment, and intended thereby to deceive and defraud the purchasers from them, and the defendants used the mails intentionally for this purpose, they could legally have convicted them, although the defendants had no intention to defraud them by failing to give them land worth the price they agreed to pay. One may be as sorely defrauded who is induced by false representations to sell his productive farm in Kansas and with its proceeds to buy for a farm and a residence a tract of land under water in Florida, although the uninhabitable and unproductive purchase may be worth in money the price paid for it for some other purpose than the production of farm or garden products and for occupation as a home. The request for the instruction was properly denied.

[11] It was not charged in the indictment that the defendants promised to return to any of the purchasers the moneys the latter paid in case they were subsequently dissatisfied with their purchases; but there was evidence that the defendants made, and also that they did not make, such promises. Their counsel requested the court to instruct the jury that they must not consider the testimony of any witness to the promise of any defendant to return the purchase money, "except as to the light it may throw upon the intent of such defendant or his good faith." During the trial the indictment was read to the jury, and in its charge the court first clearly stated to them that the government contended that the representations made by the defendants were known by them to be false in certain respects set forth in the indict-

ment, such, for example, "as to the character of the soil, its adaptability to the cultivation of crops, its condition as to drainage and reclamation, the absence of such low temperature as would occasion frosts, the necessity or nonnecessity for the use of fertilizers in the planting of crops, etc., all as is specifically set forth and charged in the indictment, which has been read to you, and I will not read it again." The court then instructed the jury that the first issue of fact for them to decide was whether or not the defendants did devise in their minds a scheme to defraud those named in the indictment "through the false pretenses, representations, and promises set forth and charged in the indictment." In a trial occupying many days and producing more than 1,000 printed pages of testimony it would be impracticable, and would tend to confusion rather than to clarity, for the court to state in the charge to the jury every item, or every important item, of evidence that has crept into the case that does not directly prove any averment of the pleadings. In this case the trial court repeatedly told the jury that the representations, whose truth or falsity they were to determine, were those set forth in the indictment. The indictment was read to them, the representations for trial were stated to them in the charge to the jury, and in that way the court told them that they were not called upon to determine, and were not trying as a crucial issue in the case, the truth or falsity of those representations not set forth in the indictment, and it was not a fatal error for the court to refuse to charge that the evidence as to the defendants' promises to return the purchase money was not directed to any express issue on trial. Under the charge given the jury could not have failed to understand that.

[12, 13] Complaint is made that the court refused to give a requested instruction to the effect (1) that men engaged in the business of selling land have a habit of puffing their wares, and so long as the statements made are within any proper reasonable bounds they are not criminally liable; (2) that in order to find that the defendants devised a scheme to defraud in the sale of this land the jury must find that the statements which were made amounted actually to a substantial deception of those to whom the lands were attempted to be sold; and (3) that a certain degree of commendation by these defendants of their lands was allowable, and was not criminal, so long as the statements were not actually made in bad faith and with an intention to deceive. There was, however, no error in refusing to give this instruction, because the second proposition in it is not the law, and because the first and third propositions, in the absence of any qualification to the effect that positive statements of material existing facts calculated to deceive, such as the statements that the soil of the land is black muck and is worth $6 a ton as a fertilizer, do not fall within the category of innocent puffing, were indefinite, misleading, and inapplicable to the misrepresentations of facts of this nature on trial in the case in hand. Harris v. Rosenberger, 145 Fed. 449, 455, 76 C. C. A. 225, 13 L. R. A. (N. S.) 762.

[14] It is assigned as error that the court refused to submit to the jury a requested instruction to the effect that the fact that a grand

jury returned an indictment against the defendants was absolutely no evidence of the guilt of any of them, and they were presumed to be innocent until this presumption was overcome by evidence which convinced the jury beyond a reasonable doubt of the guilt of some one or more of the defendants. But these propositions are found in the general charge of the court and the refusal of a court to submit rules of law to the jury in the words of counsel when they are clearly given to them in the words of the court in its general charge is not error.

[15, 16] The defendant Russell mailed the letter described in count 3 of the indictment, he was found guilty of the offense charged in that indictment and sentenced to pay a fine of $300 and to serve a year and a day in the penitentiary. He was also found guilty and sentenced to pay a fine of $25 on each of counts 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, and 12 of the indictment. There was, however, no evidence that he mailed, or had knowledge of the preparation or mailing, or directed the mailing of, any of the letters set forth in any of these counts, and it is insisted that his conviction and sentence on these counts is without support in the evidence. Where two or more persons jointly devise and execute a scheme to defraud by the use of the mails, they may thereby become in effect partners in the criminal purpose of so using the mails to defraud. If they do, the acts of each thereafter, during the existence and execution of the scheme, done in furtherance of that execution, may become the acts of all the partners, and each may be convicted of the mailing of a letter which one of his partners caused to be mailed in the execution of the scheme. Blanton v. United States, 213 Fed. 320, 325, 130 C. C. A. 22, Ann. Cas. 1914D, 1238; Hume v. United States, 118 Fed. 689, 697, 698, 55 C. C. A. 407; United States v. Kissel, 218 U. S. 601, 608, 31 Sup. Ct. 124, 54 L. Ed. 1168; Burton v. United States, 142 Fed. 57, 61, 73 C. C. A. 243. Was there substantial evidence to bring Russell under this rule? It is true that the mailing of the letters, or the causing the mailing thereof, is the gist of the offenses charged in this indictment, and that, unless there is substantial evidence that Russell caused them to be mailed, he cannot be lawfully convicted. There is substantial evidence that Chambers caused each of the letters to be mailed. In 1910, prior to the time when Chambers bought the tract of land which he subsequently sold in 1911, 1912, and 1913, Chambers and Russell had been engaged in selling lands in the Everglades of Florida as agents of the Florida Fruit Lands Company. Prior to the purchase of this land by Chambers, and prior to the sale of any of it, Russell knew the character of the land, its then availability, and its probable or improbable subsequent availability, for cultivation and homes. He knew the literature used and intended to be used to sell it, the representations made and to be made in selling it, and in the spring of 1911 he entered upon the undertaking of selling these lands of Chambers for him. There was substantial evidence at the trial that Russell and Chambers together devised and executed the scheme to defraud, and shared in the intention to use the mails to carry it into effect. There was substantial evidence that in the execution of this scheme

Russell personally caused the mails to be used to convey the letter set forth in the third count of the indictment, and that Chambers in devising and executing the scheme caused the mails to be used to convey the letters set forth in the other counts of the indictment, so that there was here substantial evidence that as partners in the criminal purpose of using the mails to defraud each was the agent of the other in the mailing of these letters, and the judgment against them must be affirmed.

[17] The defendant Harper was tried and convicted jointly with Chambers and Russell, a motion for a new trial on the ground that there was no substantial evidence that he caused any of the letters set forth in the indictment to be mailed was made, and has been held under submission by the court below to await the decision of this court in the cases of Chambers and Russell. Counsel have requested an expression of the opinion of this court upon the question whether or not there was substantial evidence in this record that Harper caused the letters set forth in the indictment, or any of them, to be mailed, and they have discussed that question in their briefs. As all the evidence on this subject is before the court and has been examined, and as a statement of the view of the court may avoid a second examination of it, the court has concluded to comply with the request. There was evidence of these facts: Harper was a nephew of Chambers. He was a young man, 32 years of age at Christmas time 1909, when he visited his uncle in Kansas City. He had been graduated from the Missouri School of Mines in 1908, and was living in El Paso, Tex., where he was employed as chemist for a copper company at a salary of $125 a month. During his Christmas visit in 1909, Chambers asked him how he would like to buy some Florida land, and told him he was selling land in the Everglades of Florida. Harper replied that he had never seen the land, that he did not know what it was, and asked him if he would advise him as a relative to purchase it, and Chambers said he would. Harper returned to his work as a chemist at El Paso. About a year later Chambers offered to employ him in Florida to show purchasers and prospective purchasers the land which Chambers had bought and intended to sell. Harper declined to go unless Chambers would pay him the same salary he was receiving as chemist, $125 a month. Chambers agreed to do so, and Harper took his wife and family to Florida, where he has lived with them ever since. He has acted as the representative of Chambers in showing his land, and in showing the lands and improvements in the vicinity of this land; but he has never sold or attempted to sell any of the land, and he never knew anything about, or had anything to do regarding, the letters set forth in the indictment, or their mailing. There was evidence that he did, and there was evidence that he did not, represent that the muck on Musa Island was of the same class as that in the Everglades, and there was other conflicting evidence about statements that he was claimed to have made to some of the purchasers. No attempt is made to set forth here all the evidence regarding his acts, but a careful reading and examination of all the testimony upon this subject has

forced our minds to the conclusion that there is no substantial evidence that he ever joined with Chambers or Russell in devising the alleged scheme to defraud with the intention to use the mails to defraud, or that he ever mailed, or ever indirectly caused to be mailed, any of the letters set forth in the indictment.

Let the judgments against Chambers and Russell be affirmed.

CARLAND, Circuit Judge (concurring). I concur in the foregoing opinion, except as to the discussion as to when a criminal case may be left to the jury to pass upon the facts. Upon this branch of the case I am of the opinion that there was substantial evidence tending to show the guilt of the defendants, and that there was no error in overruling the motion for a directed verdict.