## TILLERY v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. November 28, 1922.)

No. 3895.

1. Post office ⬤48(4)—Indictment for using mails to defraud held sufficient.

An indictment for using the mails in furtherance of a scheme to defraud *held* sufficient.

2. Criminal law ⬤1032(7)—Variance not ground for reversal, where not objected to at trial.

A judgment of conviction will not be reversed on the ground of variance between one allegation and the proof, where the objection was not made in the trial court and might have been obviated if the question had been raised.

3. Criminal law ⬤829(1), 830—Refusal of requested instruction not error, unless correct in every particular, nor where covered by other instructions given.

It is not error to refuse a requested instruction, unless it is correct in every particular, nor when, in so far as it is proper, it is covered by the charge given.

In Error to the District Court of the United States for the Western District of Texas; W. R. Smith, Judge.

Criminal prosecution by the United States against Mark Tillery. Judgment of conviction, and defendant brings error. Affirmed.

The defendant, Mark Tillery, was convicted on three counts of an indictment based upon section 215 of the Penal Code (Comp. St. § 10385). The scheme to defraud set out was alleged to be substantially as follows: That the defendants, Tillery, Stem, Price, Porter, and others unknown to the grand jury, would seek out unskilled and incautious persons and falsely pretend that Tillery was in possession of unusual means of information as to the price at which certain stocks were and would be quoted on a certain fictitious stock exchange; that it would be possible, by engaging in speculations on such stock exchange, to win large sums of money; that the defendants would thereafter pretend that they had made such speculations, and had won large sums for the joint benefit of themselves and any victims they might be able to inveigle into their scheme, but that before such sums could be collected it would be necessary for the defendants or their victims to procure and exhibit other large sums of money as evidence of good faith; that the defendants would induce their victims to provide and furnish the necessary sums of money, which they would thereafter falsely pretend to lose in another speculation, and which they would then convert to their own use. It was then alleged that one Tom Kite was selected by the defendants as one of their victims. It was next alleged that, "for the purpose of executing such scheme and artifice to defraud," the defendants deposited and caused to be deposited in the post office of the United States at El Paso, Tex., certain described writings intended to be sent and delivered by the post office establishment.

The first count alleges the mailing of two certain drafts, each in the sum of $5,000, by a bank in El Paso, Tex., to a bank in Abilene, Kan. The second count alleges the mailing of a letter from a bank in El Paso to a bank in Ransom, Kan., in which was inclosed a card with Kite's signature on it, and requesting information by wire as to whether the signature was genuine. The third count alleges the mailing of a cashier's check, payable to Kite, in the sum of $5,000, by a bank in El Paso to a bank in Kansas City, Mo.

The testimony of Tom Kite, alleged in the indictment to be a victim, was substantially as follows: He casually met the defendant Stem on a street in El Paso, and Stem pointed out to him the defendant Tillery as a man who had created a sensation in Peoria, Ill., by winning a very large sum of money upon speculations in stock. Stem then introduced Kite to Tillery, and there-

upon these two defendants discussed the possibility of speculating on the International Stock Exchange across the street. Tillery went in the direction of the Stock Exchange, and came back claiming to have won $5 for Stem. Tillery then stated that he was under a $100,000 bond to his employers, represented to be stockbrokers in New York, "not to speculate" on his own account, and that his uncle was surety on this bond. Tillery then handed to Stem what appeared to be $500, with the request that Stem go to the said Exchange and buy Mexican Petroleum stock. Stem left, and returned in a few minutes, and stated that Tillery had won $500, and handed to him what appeared to be $1,000. Thereupon Tillery stated that "they might as well make a killing," and directed Stem to place the $1,000 already won, or represented to be, on stock at the Exchange, saying at the same time that the winnings should go 30 per cent. to Kite, 30 per cent. to Stem, and the balance to Tillery. Stem left, and came back with the report that $40,000 had been won on the last speculation. Kite and the defendants then went to Tillery's room, and shortly were visited there by defendant Price, who displayed a roll of bills which he stated contained $60,000. Price stated that the amount necessary to put up in order to win the $40,000 was $20,000, and inasmuch as that amount had not been deposited with the Exchange, or in a bank, it would be necessary for the winners to raise that amount as evidence of good faith, and as showing that they could have paid, if they had lost. Price required that this amount of money should be raised within 30 days. Tillery, after claiming he had tried to raise the money and failed, appealed to Stem and Kite to raise it. Stem said he could raise half of it. Kite went back to Kansas and raised $10,000 by placing a mortgage upon his farm, and returned within a few days with the two drafts described in the first count of the indictment. Tillery went with Kite to a bank in El Paso, but did not go into the bank. He told Kite to go in and get the drafts cashed immediately, if possible, and, if not, to have them sent by mail for collection. The bank adopted the latter course and mailed the drafts. In due course the drafts were paid, and the bank delivered $10,000 in currency to Kite, which he almost immediately thereafter delivered to Tillery. At the same time Stem also handed to Tillery what appeared to be $10,000 in currency. Tillery then turned the money over to Stem, with instructions to collect the $40,000 already won, and to invest Tillery's proportion thereof by selling Baldwin Locomotive stock on the Exchange. Stem departed, and returned in a few minutes with the statement that he had invested the whole amount of $40,000. It then apparently developed that Stem had not sold, but, on the contrary, had bought, Baldwin Locomotive stock. Tillery rushed out for the stated purpose of canceling Stem's order, but returned almost immediately, declaring he was too late, and that the whole amount of $40,000 had been lost. Tillery appeared to be very angry with Stem, struck at him, and chased him around the room. Finally Tillery quieted down, and told Kite he would try to win the money back, and then asked Kite to go to Pueblo, Colo., and remain there until he heard further from him. Kite did as he was told, but upon being informed by telegrams purporting to be from Tillery that the latter had gone first to Chicago, and then to New York, Kite proceeded to his home in Kansas. A few days later he received a telegram purporting to come from Tillery, and from New Orleans, but upon arriving there Kite was informed that Tillery had just left for El Paso. Kite returned to El Paso and found Tillery there. Tillery reported that he had won $37,500, but, in order to get it, it would be necessary for Kite to raise $5,000 as evidence of good faith. In order to do this, Kite made an unsuccessful trip to his home in Kansas. Upon his return, Tillery again appealed to him to raise the necessary money, and said to him that, if he could and would do so, he (Kite) should have $20,000. Thereupon Kite made another trip to Kansas, and finally succeeded in selling his home for an additional sum of $5,000. He returned again to El Paso with a draft for this amount, which was collected at Tillery's suggestion, through the same bank at El Paso, and the draft set out in the third count of the indictment is for this last sum raised by Kite, which he paid over to Tillery as soon as the collection could be made by mail in due course of business. Tillery then stated to Kite that he was going with

him to Kansas City, Mo., and would meet him at the train, which he failed to do. Kite proceeded to Kansas City, but after remaining there a few days returned to his home in Kansas.

Tillery undertook to communicate with Kite in Kansas City in a peculiar way. He wrote a letter to a party in St. Louis, and inclosed a telegram with the request that it be sent to Kite. The telegram read: "I am having a lot of trouble; you go home, and when I get the check cashed I will come down to Ransom immediately. I will wire to your home address. Don't worry." The letter which contained this telegram was intercepted by a post office inspector upon its delivery.

The drafts and checks which were introduced in evidence, and the correspondence between the banks which handled them, corroborate Kite's story. In addition there was evidence for the government that there was no International Exchange in El Paso, and that there was no exchange of any kind there which handled Mexican Petroleum stock, or Baldwin Locomotive stock.

L. A. Dale and Royall G. Smith, both of El Paso, Tex. (Moore & Smith, of El Paso, Tex., on the brief), for plaintiff in error.

John D. Hartman, U. S. Atty., of San Antonio, Tex., N. J. Morrison, Asst. U. S. Atty., of El Paso, Tex., H. R. Gamble, Sp. Asst. Atty. Gen., for the United States.

Before WALKER, BRYAN, and KING, Circuit Judges.

BRYAN, Circuit Judge (after stating the facts as above). The court charged the jury that the burden was on the government to prove that the defendant, alone or acting with others, devised the scheme set out in the indictment; that he intended to use the scheme to defraud; that for the purpose of executing such scheme he mailed, or caused to be mailed, the letters and other mail matter set out in the indictment; and that the defendant should be acquitted unless these essential matters were proven beyond a reasonable doubt. The court refused defendant's request for a peremptory instruction to the jury to return a verdict of not guilty on all counts, and further refused special requests upon the evidence to the effect that the defendant should be acquitted if the letters and papers were mailed as an independent act of the bank, and without defendant's knowledge or direction. The court also refused a request to charge that the existence of a scheme to defraud was sought to be established by circumstantial evidence; but that request also embodied the idea that the scheme existed only for the purpose of defrauding the witness Kite.

Defendant assigns error upon the overruling of a demurrer to each count of the indictment, upon the sufficiency of the evidence to sustain the verdict, and upon the refusal to give his special requested instructions in charge to the jury.

[1] The scheme to defraud set out in the indictment and the use of the mails in connection therewith are sufficiently pleaded, and the trial court did not err in overruling the demurrer. United States v. Young, 232 U. S. 155, 34 Sup. Ct. 303, 58 L. Ed. 548; Badders v. United States, 240 U. S. 391, 36 Sup. Ct. 367, 60 L. Ed. 706; Byron v. United States (C. C. A.) 273 Fed. 769.

It was not error to refuse the requests for a verdict of not guilty upon the ground that the evidence was insufficient upon all the counts to justify a conviction. As to the first and second counts, the evidence

sustained every material allegation. Kite gave testimony in support of every element of the scheme to defraud. The testimony of other witnesses showed beyond controversy the use of the mails. According to Kite's testimony the jury were warranted in arriving at the conclusion that the post office establishment was used at the suggestion and upon the initiative of the defendant.

[2] It is specially contended that there is a variance between one of the allegations of the third count of the indictment and the evidence offered in support of it. The allegation is that the scheme contemplated that the final false pretense would be that defendants had lost all the money theretofore won; whereas the evidence is that Tillery's last representation to Kite was that he had won. The question of variance was not presented to the court at the trial. No ruling was asked upon the sufficiency of the evidence in support of this particular count. If the objection now raised could have been obviated at the trial, no reversible error is shown. 21 R. C. L. 606. It may be that it was within the power of the government to prove that Tillery, or some of the other defendants, made the representation that the proceeds of the speculation, which was reported as being a winning one, had thereafter been lost. The telegram mailed to St. Louis indicates that Tillery was preparing the way to make a claim of that nature.

[3] The special requests for charges upon the evidence, in so far as they were proper, were adequately covered by the able and exhaustive charge which the court gave of its own motion. The requested charge upon circumstantial evidence was in our opinion properly denied. It is not error to refuse a request to charge, unless it is correct in every particular. Blanton v. United States, 213 Fed. 320, 130 C. C. A. 22, Ann. Cas. 1914D, 1238; 14 R. C. L. 800. The charge here refused not only stated that the evidence of the scheme to defraud was entirely circumstantial, but also that the jury must find that the purpose of the scheme was to defraud the witness Kite. The scheme set out in the indictment was much broader than that. It was a general scheme to defraud anybody who could be victimized by it. The charge was, not that defendants planned the scheme with any particular person in mind, but only that, in pursuance of it, Kite was selected as a victim.

On the whole the fraudulent scheme charged and by which Kite was duped appears to have been well sustained by the evidence.

The judgment is affirmed.