# CASES

## ARGUED AND DETERMINED

IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS AND THE DISTRICT COURTS

---

### FREEMAN et al. v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. June 28, 1917.)

Nos. 2224–2226, 2232, 2233, 2237, 2261, 2346, 2347.

1. POST OFFICE ☞48(4)—MISUSE OF MAILS—INDICTMENT—SUFFICIENCY.

An indictment with counts under Criminal Code, § 37, Act March 4, 1909, c. 321, 35 Stat. 1096 (Comp. St. 1916, § 10201), charging a conspiracy to violate section 215 (Comp. St. 1916, § 10,385) with reference to using the mails in the execution of a scheme or artifice to defraud and other counts charging violation of section 215, setting forth generally the scheme to defraud, was not bad for failure to set out the contract with the victims or to set out that such contract was entered into, such matters being merely evidence to show the manner in which the scheme would be made effective.

2. INDICTMENT AND INFORMATION ☞65—MISUSE OF MAILS—SUFFICIENCY.

Such indictment was not bad for failure to state that the collection agency through which defendants realized on their scheme was a corporation, etc., or to show the relation of defendants to the agency; such matters being matters of evidence.

3. POST OFFICE ☞35—MISUSE OF MAILS—INDICTMENT—SUFFICIENCY.

In a prosecution under Criminal Code, § 215, letters set out in the indictment advising of the receipt of a list of claims by the collection agency through which defendants operated and of the intended call of a special agent to close up the contract through which defendants realized on the scheme showed on their face that they had some power or instrumentality in the execution of the scheme to defraud.

4. POST OFFICE ☞35—MISUSE OF MAILS—LETTERS TO OR FROM OTHER VICTIM.

In a prosecution under Criminal Code, § 215, for using the mails in the execution of a scheme to defraud, the letter which is mailed need not be one to or from the intended victim of the fraud.

5. POST OFFICE ☞35—MISUSE OF MAILS—LETTERS—KIND.

The scheme being one for obtaining money, the use of the mails for the purpose of assisting in retaining the money or to convey to the victim assurances calculated to lull him into inaction is within Criminal Code, § 215, condemning the depositing in or taking from the mails any letter, etc., for the purpose of executing any scheme to defraud.

6. POST OFFICE ☞48(4)—MISUSE OF MAILS—INDICTMENT—SUFFICIENCY.

An allegation that the letters therein set out were mailed "for the purpose of executing the said scheme and artifice to defraud and for the purpose of attempting so to do," the letters themselves indicating that they had such tendency, sufficiently alleged that the letters were mailed for the purpose of executing the scheme.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. CONSPIRACY ⟨⟩43(9)—INDICTMENT—SUFFICIENCY.
Counts charging "that defendants * * * wrongfully, etc., conspired, etc., together * * * for the purpose of executing the said scheme and artifice to defraud * * * and attempting to do so, to place and cause to be placed letters in the post office," sufficiently charged a conspiracy to use the mails in the execution of the alleged scheme to defraud and showed that the letters and other things therein stated as overt acts had power to effect the object of the conspiracy.

8. CRIMINAL LAW ⟨⟩444—EVIDENCE—ACCOUNT BOOKS—IDENTIFICATION—SUFFICIENCY.
In a prosecution under Crim. Code, §§ 37, 215, charging that defendants through collection agencies used the mails in the execution of a scheme to defraud by securing in advance of collection "realization charges," a book in which were entered such charges received by the manager of the Chicago office and admitted in the light of an admission or declaration of the defendants was sufficiently identified if shown to have been kept with the knowledge and under the general directions of such manager.

9. POST OFFICE ⟨⟩49—USE OF MAILS—EVIDENCE—MOTIVE AND INTENT.
Where the fraudulent scheme had been shown, it was competent to prove the extent to which the charges were solicited and secured as bearing on the motive and intent, although in many cases it did not appear whether the fraudulent representations were made to secure them; the scheme not being concocted with reference to any definitely intended victims.

10. CRIMINAL LAW ⟨⟩1169(1)—REVIEW—ADMISSION OF EVIDENCE—HARMLESS ERROR.
The essential elements to be shown were the fraudulent scheme and the use of the mails in its execution and admitting in evidence an account book showing the receipt of $130,000 realization charges was without prejudice; it not being necessary to show the extent of the success of the scheme.

11. CRIMINAL LAW ⟨⟩447—PAROL EVIDENCE RULE—APPLICABILITY.
In such prosecution the rule against varying written contracts by parol was inapplicable, the contract with the victims being merely one of a series of evidentiary facts bearing upon the ultimate question whether a scheme or artifice to defraud through the mails was devised or intended to be devised.

12. POST OFFICE ⟨⟩49—WRONGFUL USE OF MAILS—EVIDENCE—SUFFICIENCY.
Evidence *held* insufficient to show that the warnings given agents against making the false representations charged were made in good faith and with intent that they should be acted upon.

13. POST OFFICE ⟨⟩35—WRONGFUL USE OF MAILS—EVIDENCE—SUFFICIENCY.
The fact that after defendants received advance payments for the collection of claims which they knew to be worthless they attempted to make collections would be no excuse.

14. POST OFFICE ⟨⟩35—WRONGFUL USE OF MAILS—EVIDENCE—SUFFICIENCY.
That the contract with the victim had three years in which to run did not make the defendants immune from prosecution for the period fixed in the contracts.

15. POST OFFICE ⟨⟩35—WRONGFUL USE OF MAILS—EVIDENCE—SUFFICIENCY.
In a prosecution for using the mails in furtherance of a scheme to defraud in violation of Crim. Code, § 215, it is not necessary that nothing is to be given in return for the money.

16. POST OFFICE ⟨⟩35—WRONGFUL USE OF MAILS—EVIDENCE—SUFFICIENCY.
In a prosecution under Crim. Code, § 215, it is not essential to prove that the scheme contemplated a use of the mails; it being sufficient to prove that the mails were in fact used in the execution of the scheme.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

17. POST OFFICE ☞35—WRONGFUL USE OF MAILS—EVIDENCE—SUFFICIENCY.
    Where the execution of the scheme to defraud would have been utterly impossible without the use of the mails, all who participated in the scheme would be guilty, although they did not actually deposit or take from the mails any letters.

18. POST OFFICE ☞49—INTENT TO USE MAILS—EVIDENCE—SUFFICIENCY.
    Evidence that the conspiracy to defraud was to be executed, and that the use of the mails was indispensable to its execution, sufficiently showed the intent to use the mails as a part of the conspiracy.

19. POST OFFICE ☞49—INTENT AND GOOD FAITH—EVIDENCE.
    Evidence that the bankrupt debtors of the victims had been discharged, throwing light on the collectibility of the accounts, was competent as throwing light on the intent and good faith of defendants in representing that they could and would collect the claims.

20. CRIMINAL LAW ☞200(6)—DOUBLE CONVICTION—IDENTITY OF SUBJECT-MATTER.
    In a prosecution under Crim. Code, §§ 37, 215, where the conspiracy counts set forth as overt acts the mailing of letters not set out in counts under section 215, the contention that a conviction on the conspiracy counts, as well as on the others is a double conviction was untenable.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Abram H. Preeman and others were convicted under an indictment charging under Criminal Code, § 37, a conspiracy to violate section 215 and a violation of section 215, and bring error. Judgments affirmed.

An indictment of 35 counts was returned against plaintiffs in error (hereinafter called defendants). Demurrers were overruled, and after a long trial a general verdict of guilty was found against all. Motions for new trial and in arrest being denied, judgments were entered, and the defendants sentenced. Each prosecutes a writ of error; the errors assigned, and the transcript, briefs, and arguments presented, being by stipulation applicable to all the defendants.

Counts 25, 26, and 35 charge defendants under section 37, U. S. Criminal Code, with conspiring to violate section 215 of that Code; all the other counts charging in varying language a violation of said section 215. The general purport of the facts appearing from the very voluminous transcript will be set forth as briefly as may be.

In the early 80's a concern known as the Barr & Widen "Commercial" Agency, composed of one Barr and one Widen, established a collection and credit reporting business or agency at St. Louis, Mo., for making local collections for and credit reports on merchants and others of that city. The concern did considerable business and enjoyed a good reputation. In about 1900 they began to do business outside of St. Louis; the solicitation and transaction of the collection business outside of St. Louis being thenceforth carried on under the name of Barr & Widen "Mercantile" Agency. In 1904 Barr died. Shortly before his death defendant Wendler became associated with the concern as general manager of the "Mercantile," Widen attending to the affairs of the "Commercial," which under its old name continued to carry on the local business. In 1909 Wendler became a partner of Widen, but the names of the concern remained unchanged. Widen died in November, 1912. From time to time there was developed a plan for soliciting business from outside concerns all over the United States, through agents instructed and trained to solicit contracts from prospective clients, and to obtain from them payment in advance of sums called "realization charges."

The plan of procedure during the period of time particularly here involved, for interesting the outside clients in the proposition, as appears from testi-

mony of representatives of many of the concerns with whom the Mercantile had dealings, and of solicitors and agents through whom the business was conducted, was substantially as follows: Under the general direction of defendants Wendler and Preeman, at considerable expense persons were sent to various District Courts of the United States, there to examine the bankruptcy records, and tabulate the bankruptcies there shown for a considerable number of years back, listing the various creditors and data which the records disclosed as to the claims. This information was sent to Wendler at St. Louis, or to defendant Preeman at Chicago, his chief assistant. The data thus secured was classified. so that the bankrupt claims shown by the various court records to be owing to a concern of a given city would appear together. In the general office the data concerning the several creditors in a city about to be visited was transcribed upon cards; each card containing the information thus gathered in regard to outstanding bankrupt claims of a given creditor concern of the city. These cards were known as "leads" or "lead cards," and all the cards for a given city were sent to the agent about to visit the city to afford the agent information which, when used as contemplated, was calculated to arouse or stimulate the interest of the prospective client in the proposed plan.

The proposition to join a commercial agency ordinarily striking no responsive chord in the prospect, the agent would casually inquire if the concern had not some time before sustained loss through a certain bankruptcy. Receiving an affirmative reply, the agent would suggest further facts in regard to the loss that the particular lead card showed, and might inquire as to other bankruptcies in which the lead card had informed him the prospect was interested. The prospect, not suspecting the deliberate manner whereby the information had been obtained, nor the purpose of it, would inquire how the agent knew of these things, and was informed that his concern made a specialty of looking up and collecting desperate claims, particularly from bankrupts, and would then suggest as to one or more of these bankruptcies that they had discovered a responsible silent partner, or that the debtor had concealed a large amount of assets or had in some other suggested manner perpetrated a fraud upon his creditors, and would often say that they had already instituted proceedings for other creditors of the same bankrupt which promised very early success, and would like to include this claim, and in many cases would state that attachment proceedings had been begun, or were about to be begun on discovered property, and that they had property secured sufficient to pay the creditors, and that it would be a matter of only a short time, frequently fixed by the agent, before the claims against the bankrupt, which were turned over to them, would be realized fully or in large part. The calculated and the frequent effect of such representations was to induce in the mind of the prospect a belief that, if the claim was turned over, payment within a short time (often designated) would be certain to follow.

This agent did not proceed so far as to suggest that the prospect should make any payment in advance, but he invariably suggested to the prospect that not only as to the claims referred to, but as to the collection of all old and desperate claims, his concern were specialists, and that, if the prospect would supply him with a list of all his old and desperate claims, he would send in the list to the home office, and obtain from the office a proposition for the collection of such claims, and that, if the prospect did not accept the proposition, no possible liability would be incurred. This appearing to be fair, a list of such old delinquent claims was prepared and given the agent, and was by him mailed to Wendler or Preeman. Thereupon a letter was sent by Wendler to the prospect, advising of receipt of the list handed the solicitor for the purpose of arriving at a basis for charge for the service, and that in due time a special agent will call and submit a contract.

In the course of a few weeks another person would call on the prospect, presenting a proposition for making the collections, which was in the form of a long contract, mostly in fine print. This man was known as the "contract man" or "closing man"; the solicitor who secured the list being known as the "list man" or solicitor. Through the presentation of the proposed contract the prospect was first informed that he was expected to pay the agency in

advance a specific sum which was written in the contract. It appears that the sum to be paid was usually arrived at through Mr. Preeman first making an estimate of the amount to be written in the contract as the "minimum recovery," to be later explained, which was arbitrarily fixed at approximately 20 per cent. of the total of the claims listed, and that the "realization charge" was arbitrarily fixed at 25 per cent. of the "minimum recovery," so that, in case the prospect had submitted old claims aggregating, say, $20,000, the minimum recovery would be fixed at about $4,000, and the realization charge at about $1,000, which last amount the contract man undertook to get the prospect to pay in advance. Of course, the prospect generally demurred to paying anything in advance, particularly the amount asked, which was usually a substantial sum. In the excellent "teamwork" which the evidence revealed, it appears that the contract man was also supplied with "lead cards," and in most instances he knew generally or specifically the particular sort of story the list man had told the prospect concerning the collectibility of the bankrupt claims. Such stories, which never had the remotest foundation in truth, beyond the fact that the bankrupt claims existed, the contract man would reiterate, and in many instances amplify, stating (out of whole cloth) the further progress that had been made in a particular matter, holding out roseate prospect of speedy realization thereon, in which case, through such collection alone, the required advance payment would be largely, if not fully, repaid, or even yield a surplus over the payment, but usually suggesting that, unless the prospect promptly came in, he would lose the benefit of the proceedings which were in progress against the particular bankrupt debtor. That the list men and contract men well knew that all these stories of secret partners, concealed assets, fraud, attachment, and other proceedings, and all the representations as to the collectibility of the bankrupt claims were wholly false, appears from the fact that they themselves usually concocted the particular tale to suit the particular case.

To enable contract as well as list men to further impress the prospect, each of them was provided with a formidable outfit of letters of recommendation, some purporting to be originals, but most of them photographs or other reproductions, lauding the agency for its achievements, and some of them referring to specific instances where collections had been made from debtors who had gone into bankruptcy. Some of the latter were genuine letters, but the evidence shows they were obtained from the creditor, under his belief that the agency had made the collection from the bankrupt, when in truth the agency, or rather some of the defendants, paid the creditor the claim (generally a small one) for the very purpose of procuring from the creditor the letter, to be used by the agents as a lure to obtain business from others. The uncontradicted evidence of bankrupts showed a number of instances where the bankrupt referred to in the letters did not know of the agency or the defendants, and had made no such payment. Other such letters purported to be on the letter heads of corporations with high-sounding names, but which had no existence, and the letters were pure fictions. Others of such letters were shown to be absolute forgeries. Quite occasionally prospects were referred to St. Louis banks or business houses for the responsibility of the concern, and these knowing nothing of the "Mercantile," but only of the "Commercial," which operated wholly in St. Louis, would occasionally make favorable reply, without knowledge of any distinction between the "Commercial" and the "Mercantile." Indeed, the agents were not allowed to operate in St. Louis, and "realization charges" were not solicited there.

The "Mercantile" agents were not only prohibited from operating in St. Louis, but were also warned not to solicit business from any former clients of the agency anywhere. So particular were the managers in this regard that the "lead cards" themselves showed on their face whether or not the concerns thereon referred to had ever been clients of the "Mercantile," and, if so, the positive instructions were to avoid them. Agents were also strictly forbidden from calling on members of an organization known as the Credit Men's Association, and the lead cards showed who were such; the abbreviations "OC" and "CMA," often appearing in lead cards and frequently in letters, being well understood by the agents referred to as meaning "old clients" and members of

the "Credit Men's Association," who were in no event to be solicited—old clients, for manifest reasons, and the others because 'of the activity of the Credit Men's Association in exposing and warning against the operations of the "Mercantile."

In many instances the representations made were supplemented by the agent's promise that if within a short period, as promised, varying from a few weeks to a year, sufficient was not' collected and paid over to the client to equal the realization charge, the difference would be returned to him. It was often also represented that the realization charge would be used to pay expenses incurred for costs, attorney's fees, and the like in the claims in which the represented proceedings were begun or about to be commenced.

Influenced by such representations, the victims frequently signed the contract, paying the contract man, usually by check to the agency, sums varying in amount from $50 to $3,000, the aggregate of the realization charges as to which there was evidence offered of such representations to bring about their payment being many thousands of dollars. In many instances the prospect, becoming at once suspicious, undertook, occasionally with success, to stop the payment of his check. To circumvent this as far as possible banking arrangements were made in several of the cities in which business was being solicited, whereby the checks might be cashed at local banks.

When considerable time had passed since the payment, and, as was always the case, nothing was heard from the agency, the client would write for information, and would receive a letter explaining the difficulty of collecting old claims, and exhorting the client to be patient. In the first letter, or later, the client would refer to the agent's promise of speedy results as to particular claims, and thereupon Wendler would write calling attention to the contract, and to the statements therein, as well as in the literature of the agency, that the terms of the written contract may not be varied by its agents. In this connection it may be stated that in case the prospect called attention of the contract man to that part of the contract which prohibited agents from making any such representations or variation, the contract man would produce his printed card, which described him as "special representative," and would explain (as per his previous instruction) that he did not come within the class of solicitors as mentioned in the contract, but that he, as "special representative," had full power to make binding promises, even though the form contract was thereby varied.

It appears that in most, if not all, instances when claims were received, they were listed at the St. Louis office, and a form letter demanding payment would be sent out to the debtors named, and this was about all that would be done, except when the client made complaint further form demand letters would be sent out. In practically no case as to which evidence was offered was anything collected on the list of accounts submitted, nor any effort made to collect, beyond sending out the form letters. Indeed, it is apparent from the evidence not only that practically all such listed old accounts were absolutely worthless, but that the agency and the persons acting and dealing in its name had not the slightest reason to believe they were otherwise.

Notwithstanding the representations as to the use to be made by the agency of the realization charges, it appears that as fast as received they were divided in the proportion of 35 per cent. to Wendler for the St. Louis office, 65 per cent. to Preeman, who gave the contract man 25 per cent. the list man 10 per cent., retaining the remaining 30 per cent. for his own compensation and to pay the expenses of the Chicago office; and the evidence plainly warrants the inference that it was never intended any substantial portion of the realization charges should be devoted to the expense of collecting the listed claims, nor indeed that there would be any expense beyond that for clerical work, postage, and stationery for sending out the form letters.

Defendant Preeman was first employed at the St. Louis office in 1906, and about 1909 came to Chicago and assumed charge of the fieldwork. Under his general direction the men were trained in the agency work, and there are in evidence many letters between Wendler and Preeman and different ones of these agents. The defendants, other than Wendler and Preeman, were list men or contract men, some both at different times. Day and Minehart were the

most active in securing the realization charges. Finkelman, Pender, and Stevens were in this respect next in importance. As to Fellers and Worman there were comparatively few instances shown where they were instrumental in securing the realization charges, but nevertheless such instances appear as to each of them. All the agents were duly trained and instructed, and most, if not all, participated in instructing and training some of the many others for this work.

The evidence offered in defense consisted wholly of the testimony of several employés of the St. Louis office, from which it appears that in that office there was employed a corps of assistants, largely typewriter girls, through whom there was conducted an extensive correspondence with reference to the collection of claims which came to the office: that each claim received had attention, which consisted mainly in sending to the debtor, the form letters; that the agency had formulated a list of attorneys in most of the cities of the United States to whom claims were sent for collection, and through whom occasional suits were brought to collect claims; that during the period of time covered by the inquiry the agency had collected for and remitted to clients generally claims of a very considerable aggregate, and that a few of the collections made were from bankrupt debtors, and that the clients themselves had been supplied with and had made use of form letters which the agency had supplied them, with which they had themselves collected a considerable number of claims without charge by or commission to the agency, and that in certain instances the service to clients had proved satisfactory.

Sentences were:

Wendler and Preeman: Each three years imprisonment on each of counts 1 to 6, 11 to 16, 18, 19, 20, 28, 29, 32, and 33, to run concurrently, and fine of $1,000 on each of these counts; three years on counts 7 to 10, 17, 21, 24, 27 to 30, 31, and 34, to run concurrently beginning at expiration of sentence on former counts, and fine of $1,000 on each of these counts; two years on each of counts 25, 26, and 35, to run concurrently and to commence at expiration of sentence on counts last mentioned, and fine of $3,000 on each of these three counts—aggregate as to each, imprisonment eight years, and fine, $44,000.

Day and Minehart: Each two years on each of counts 25, 26, and 35, to run concurrently, and fine of $5,000 on count 25; two years on each of counts 1 to 24 and 27 to 34, to run concurrently beginning at expiration of sentence on previous counts—aggregate as to each, imprisonment four years, fine, $5,000.

Finkelman, Pender, and Stevens: Each two years on each of counts 25, 26, and 35, and fine of $2,500 on counts 25; one year on each of counts 1 to 24, and 27 to 34, to run concurrently beginning at expiration of sentence on preceding counts—aggregate as to each, imprisonment three years, fine, $2,500.

Fellers and Worman were each sentenced to nine months' imprisonment in House of Correction on each of counts 1 to 35, to run concurrently.

Many errors are assigned; those we deem sufficiently important being stated where they are considered in the opinion, in which also some further facts are given.

Patrick H. Cullen, of St. Louis, Mo., and William S. Forrest, of Chicago, Ill., for plaintiffs in error.

Charles F. Clyne and Henry W. Freeman, both of Chicago, Ill., for the United States.

Before KOHLSAAT, MACK, and ALSCHULER, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above).
[1] 1. It is urged that the indictment is defective in failing to set out the contract above referred to, or to set out that such contract was entered into. The case of Hurst v. State, 39 Tex. Cr. R. 196, 45 S. W. 573, and others are cited to sustain the contention. But they are cases where the defendants were charged with the offense of obtaining property through some fraudulent scheme or pretense. This indict-

ment charges defendants with using the mails in execution of a scheme or artifice to defraud which they had devised; the conspiracy counts charging a conspiracy to so use the mails. Where the charge is that of obtaining property by fraud, the material elements of the fraudulent scheme whereby the property was obtained should be set forth in the indictment; but here it is necessary only to set forth generally the scheme or artifice which the defendants devised, and to charge the use of the mails in execution of the scheme. Durland v. United States, 161 U. S. 306, 16 Sup. Ct. 508, 40 L. Ed. 709; Bettman v. United States, 224 Fed. 819, 140 C. C. A. 265; Farmer v. United States, 223 Fed. 903, 139 C. C. A. 341; Gourdain v. United States, 154 Fed. 453, 83 C. C. A. 309. And the scheme itself is not required to be charged with the detail and particularity necessary in an indictment for the specific offense of obtaining property through false representations. Bettman v. United States, supra; Emanuel v. United States, 196 Fed. 317, 116 C. C. A. 137; Blanton v. United States, 213 Fed. 320, 130 C. C. A. 22, Ann. Cas. 1914D, 1238; Foster v. United States, 178 Fed. 165, 101 C. C. A. 485.

In apt language the counts set forth the scheme to represent that bankrupt debtors of the victim had fraudulently concealed assets, or that there were responsible secret partners; that seizures of property had been made or were about to be made for other creditors; that the collection would surely be made; and other of the alleged knowingly false and fraudulent matters and things above stated. We regard the contract as evidence tending to show the manner in which the fraudulent scheme to obtain money would be made effective, and as such unnecessary to be referred to in the indictment.

[2] 2. Insufficiency is claimed because the indictment fails to state what the Barr & Widen Agency is, whether a partnership, corporation, or whatever else, and because the relation of the defendants to the agency is not stated. Had the Barr & Widen concern been a defendant or a victim of the fraud, it might have been necessary to allege its capacity as a business entity. But, appearing only as a means through which defendants realized upon their scheme to defraud, it is not material what was its precise legal capacity. If defendants fraudulently devised a scheme to falsely represent the "agency" as having done things which it had not, or as having information concerning, or taken steps affecting certain bankrupt debtors, which it had not, the fraudulent scheme is the same, whether the alleged "agency" be corporation, partnership, or what not. In brief for defendants it is said:

"The allegations all the way through indicate, however, that it [the agency] is a body of men that have been engaged in the collection business."

This being so, the indictment sufficiently advised defendants that the "agency" had in some capacity the right to transact business, and could have participated in the execution of the scheme which defendants had devised. If in preparing their defense defendants needed to be more fully informed of the legal capacity of the agency, motion for a bill of particulars would doubtless have elicited whatever, if any, further facts thereon the government possessed. Foster's Federal

Practice, § 522; May v. United States, 199 Fed. 53, 117 C. C. A. 420. And what is said on this point applies as well to the contention as to failure to allege the relation of defendants to the "agency." Whether they constituted it or were employed by it, or whether they had or had not a right to make representations concerning it, were matters, not of allegation, but of evidence, bearing on the proof of the scheme and its conception and operation.

[3] 3. It is insisted that the letters set forth in the several counts as having been mailed inherently show they had no power or tendency to execute the alleged scheme, and that it is not sufficiently alleged that they were mailed for the purpose of executing the scheme. Our reading of the indictment letters, far from convincing us that on their face they had no power or tendency to execute the fraudulent scheme, induces the opposite conclusion. The letters set forth in 14 of the counts are presumably to various of the intended victims, signed by defendant Wendler, and are all in substantially the following form appearing in count 11:

"Stromberg Motor Devices Co., Chicago, Illinois—Gentlemen: We are in receipt of advice from our solicitor of the list of your present delinquent claims, that you had handed him, for the purpose of arriving at the basis for charge covering our service, and one of our special representatives will call upon you in the near future regarding the same. Thanking you for your courtesy in the matter, we beg to remain, very respectfully, Barr & Widen Mercantile Agency, F. L. Wendler, General Manager. April 23, 1912. L–30."

Surely such letters advising of the receipt of the list of claims, and of the intended call of a special agent to close a contract, show on their face they had some power or instrumentality in the execution of the scheme to defraud.

[4] In most of the other counts under section 215 the letters set forth as having been mailed in execution of the scheme to defraud are from Preeman to various agents in the field, some referring to the sending of lead cards, other encouraging the agent, or giving directions relating to the business of realizing on the alleged plan fraudulently to secure money from victims. The letter which is mailed need not be one to or from the intended victim of the fraud, in order to come within the terms of section 215. The execution of the scheme may be, and here was, most effectively furthered, and the purpose of its execution or attempted execution most directly served, through communications by mail between the persons who concocted or entered into it.

[5] Some of the indictment letters refer to the stoppage by the victims of payment on checks given for realization charges, and one of them (count 22) is an acknowledgment of receipt of a list of claims and of a contract, promising prompt attention and enclosing further blanks for claims. The scheme alleged, being one for obtaining money through the fraudulent representations and practices set forth, the use of the mails, even after the money is received, for the purpose of assisting in retaining the money, or to convey to the victim assurances calculated to lull him into inaction and to postpone, perhaps indefinitely, his taking action in respect to his loss, is within the purview of the

law which condemns depositing in or taking from the mails any letter, etc., for the purpose of executing any scheme to defraud. Farmer v. United States, supra.

[6] The counts charge that the letters therein set out were mailed "for the purpose of executing the said scheme and artifice to defraud, and for the purpose of attempting so to do"; and as the letters themselves do not indicate that they could not and did not have such tendency, but, on the contrary, carry the inference that they could and did, we find no merit in the contentions in this regard.

[7] 4. The conspiracy counts (25, 26, and 35) are criticized mainly for their alleged failure sufficiently to aver that the conspiracy charged does not include in its purview the use of the mails in the execution of the contemplated fraud, and that the indictment letters and the other things stated therein as overt acts manifestly had no power to effect the object of the conspiracy. The counts charge:

"That the defendants  *  *  *  unlawfully, etc., conspired, etc., together, *  *  * for the purpose of executing the said scheme and artifice to defraud *  *  * and attempting to do so, to place and cause to be placed letters in the post office."

We regard this as sufficient averment of a conspiracy to use the mails in execution of the alleged scheme to defraud. Stokes v. United States, 157 U. S. 187, 15 Sup. Ct. 617, 39 L. Ed. 667; Emanuel v. United States, 196 Fed. 317, 116 C. C. A. 137.

In each of these counts the sending of letters of the same general purport as those heretofore referred to is charged by way of overt acts, and in counts 25 and 26 there are further charged as overt acts such things as sending lead cards, securing lists of delinquent accounts, the meeting of certain of the defendants at particular places—all charged as having been done in pursuance of the conspiracy and to effect its object.

It seems clear that all such acts from their very nature may well have been influential in effecting the object of the conspiracy, and without here presenting analysis or discussion of counsel's elaborate argument to the contrary, we find the counts sufficient in this respect.

Other objections to the indictment are urged with much detail of argument and authority, but they seem to be largely refinements of such matters as we have considered, and in most instances quite too hypercritical to serve as substantial and fatal objections to the indictment or any of its counts, which, upon careful consideration, we conclude duly and sufficiently advised defendants of the nature of the charges thereby preferred.

[8] 5. Error is assigned on the admission in evidence of a certain book in which were entered the "realization charges" which were received at Preeman's office for about three months of 1912. A tabulation of these showed a total of about $130,000 received for this period. It is claimed not only that the book was inadmissible as not being properly authenticated, but that in no event were its contents competent evidence, and that great harm accrued to the defendants through its admission, because it showed not only the realization charges as

to which there was offered evidence of fraud, but also realization charges as to which there was no evidence of any fraud offered, and also many which were not sent in by defendants, but by other agents in the field.

As to the authentication of the book, it appears that it was regularly kept in the Chicago office, where defendant Freeman was in control. Those who kept the book were his employés, and it may well be concluded that it was under his general direction that the book was kept, although he made no entries in it. Freeman and the other defendants were interested in the book, in that it was the record of the realization charges, of which Wendler, Freeman, the solicitors, and the list men were to receive certain proportions. The men who kept the book testified to the correctness of its entries, which were made as the checks were received, and even if the book were required to be authenticated with the particularity of account books offered in evidence on behalf of those by or for whom they were kept, we find such requirements to have been substantially complied with. But the book was offered and admitted rather in the light of an admission or declaration by the defendants or some of them, and as such the book would be sufficiently identified if shown to have been kept with the knowledge and under the general direction of defendant. Bettman v. United States, 224 Fed. 819, 140 C. C. A. 265.

[9, 10] As to the contention of the incompetency of the book, it did not appear that the fraudulent scheme proved was concocted with reference to any definitely intended victims, but should be operative as to any and all whom the agents might undertake thereby to influence. Indeed many of the other agents shown by the book to have secured such realization charges, were of the witnesses by whom the fraudulent scheme was proved. The fraudulent scheme being shown, it was competent to prove the extent to which realization charges were solicited and secured, as bearing on the motive and intent of those who concocted the scheme, even though in many cases it did not appear whether fraudulent representations were made to secure them. It must be borne in mind, however, that the extent of success of the scheme as charged under section 215 was in no manner necessary to be shown, the only essential elements being the fraudulent scheme and the use of the mails in its execution. But in any event no prejudice to the defendants resulted from this evidence. Even had the jury believed that the total amount of realization charges shown in the account book had been secured by the defendants, and by fraud, nevertheless they could only have found the defendants guilty, which was all they could do with the proof showing only $10,000 of these realization charges to have been so secured by them.

And in this connection it may be noted that one line of defense consisted in showing by witness Salter the great volume of business which the agency had transacted—the many thousands of claims handled, and of dollars collected since the year 1901. And one item of evidence was a long list of realization charges aggregating many thousands of dollars, collected from concerns not in evidence as complaining, showing in each such case where collections had been made of at least two and

one-half times the amount paid. On cross-examination Salter testified without objection that about 12,000 had paid realization charges. Surely all this evidence coming from practically the only witness of importance offered for the defendants, and designed to show the magnitude of the business which the agency transacted, is quite inconsistent with any claim of prejudice arising from evidence offered by the government of large receipts of realization charges within a given time.

[11] 6. It is seriously contended that all evidence was incompetent whereby it was shown that defendants had made representations of promises to intended victims inconsistent or conflicting with the terms of the contracts which were executed, on the ground that, the contracts being in writing and signed by the parties to them, no evidence was admissible to vary their terms. As before observed, the indictment charges the use of the mails by defendants for the purpose of executing the alleged scheme or artifice to defraud, and if the evidence shows that the scheme devised or intended to be devised was the false representation of past or existing·facts to induce belief of ability to collect certain stale accounts, and that thereby the intended victims were to be defrauded of their money, it is not essential that one of the steps in the carrying out of the fraudulent scheme was the signing of a contract. The rule against the varying of written contracts by parol, applicable to instances where the contract is the subject-matter of the controversy, has no relevancy here, where the contract is merely one of a series of evidentiary facts bearing upon the ultimate question whether a scheme or artifice to defraud was in fact devised or intended to be devised.

The relation of the contract to the transaction was well described in a letter of October 12, 1912, from Preeman to agent Lappe, when, as trouble seemed to be brewing for the "agency," he wrote:

"Relative to the contracts received, wish to advise you there has been still another change made in the contract, namely, as per sample herewith inclosed, and I understand this will be the final contract—at least, until the present agitation subsides. The firm has been compelled to make this change on account of certain statements made by the contract men regarding matters of fact relative to claims. If it were not for the fact that I have been on the firing line myself, and sold a great many contracts, I might be inclined to make the statement that it will be hard to close these contracts. My experience, however, teaches me that the contract has very little to do with it, and I think you will find this to be a fact after you get out on the proposition."

[12] 7. The claim is persistently made that under all of the evidence the conclusion of·guilt is wholly unwarranted as to any of the defendants, mainly because: (a) The agency repeatedly instructed and warned agents against making any of the false representations charged and proved as constituting the alleged scheme to defraud, and the contract form as well as the printed letter heads of the agency carry on their face notice that the agents had no power to make representations or agreements not contained in the form of the contract; (b) the contract provides for a three-year term of service of the agency, during which time all delinquent accounts of the client must be sent to the agency for collection, and that not till the end of that period could it be known whether the contract was or would be fulfilled; (c) the

agency in good faith intended and tried to fulfill the contract, undertook to collect each account sent it, and did in fact collect large amounts for clients, and stood ready to serve them as in the contract provided during the term of its existence; that in practically every instance as to which proof showed the money was obtained through the fraud alleged the three-year period had not expired, and that the executed contract was broken by the client through failure to send to the agency current delinquent accounts, and that as a further consideration for the contract, the agency was to furnish and did furnish clients certain form letters for collection by the client of its own accounts, and that thus everything in the way of service and the like which was intended to be given and which the contract provided should be given the client was in fact given, or the agency in good faith stood ready to give it.

It appears that in most instances an agent entering the service of the "agency" was required to acknowledge receipt of a printed circular called "Instructions to Solicitors," in which it was stated, among other things, that the solicitor's power was limited to soliciting and closing the printed contracts unchanged, and forbidding the use of testimonials except such as were supplied by the agency, and from securing business by other than "legal, legitimate, and truthful methods," and from stating to prospective clients that the agency "has any knowledge whatever as to any matter of fact that would make possible or probable the collection at any time of any claim," or that the "agency has made any investigation as to the collectibility of any claim prior to the closing of the contract," or that the "agency will refund all or any part of the realization charge in case this agency fails to recover the amount of minimum recovery." In the contract forms and on other stationery was also printed notice of the solicitor's want of power to vary the form of contracts.

If all this has been in good faith, with expectation of observance of these instructions, it might carry inference of the innocence of wrongdoing of those in charge of the project, men like Preeman and Wendler; but if, on the other hand, these fulsome warnings and notices appear from the evidence to have been merely a hypocritical pretense devised and employed with the view only of protecting from possible evil consequences of the scheme, a foil to parry the charge of fraud in case of prosecution, the fraudulent scheme and purpose is thereby only intensified. That this was really "an anchor to the windward" to provide for safety in time of stress, the jury was well warranted in concluding from the evidence. On cross-examination by defendants' counsel of different agents, letter after letter from Wendler was produced reproving the agent for making misrepresentations complained of, and threatening discipline and discharge; but few, if any, were for such cause discharged, none permanently, notwithstanding the constant stream of complaints coming to Wendler from the victims of the misrepresentations and promises of the very kind so peremptorily forbidden to be made in the "Instructions to Solicitors." A significant instance occurred in 1909 when Preeman then a field man had been instrumental in obtaining a contract, with the result that shortly afterwards a letter from the victim reached Wendler calling attention to the representations which Preeman had made to secure it; whereupon

Wendler wrote the usual reply, stating that Preeman was only a solicitor, and that if promises, representations, or changes in the contract had been made by him the responsibility was up to Preeman and the victim, and not the "agency," but assuring the victim that Preeman's services had been dispensed with, and that notice to that effect had been duly published. But contemporaneously with this correspondence it appears there were continuous lively and friendly exchange of letters between Wendler and Preeman, referring, among other things, to this contract, but without suggestion of dismissal or disciplining of Preeman; on the contrary, his rapid rise in the service appears, soon becoming, and thenceforth remaining, second in importance only to Wendler himself.

At times there was indeed reproof of agents, genuine reproof; but not because of the fact of misrepresentation, but the quality of it, in the rashness and imprudence displayed, as for instance, where an agent, utterly without any foundation in truth, stated that a certain named boat then alleged to be at a certain named dock was about to be attached by the agency, and again that an automobile of a certain debtor would pass through a nearby point at a certain time in the near future and would be seized by the agency—all as inducements to the client to close at once so as to get in on the proceeds. Of course, such representations were too specific and immediate to be at all consistent with safety, and for such gross imprudence reproof manifestly was well merited.

Agent after agent testified to being advised to pay no attention to such instructions and warnings; that these were merely for protection in case of trouble. And the agents themselves, when expressing worry about their own possible liability, were assured that whoever executed one of these contracts "signed away his life," and that there could be no possible "come-back." Two letters from Preeman to agent Myers, written in the early fall of 1912, well illustrate the utter hollowness of any pretense of virtue in these oft-reiterated instructions and warnings. One reads:

"You must adhere strictly to your printed instructions to solicitors signed by you and refrain absolutely from making any representations to any prospective client or patron that you or Barr & Widen Mercantile Agency have any knowledge of any kind or character as to any matter of fact regarding the collectibility of any claim or claims, or that any claim of client or patron had been investigated prior to execution of contract."

And the other:

"Relative to instructions to solicitors which you inclosed, duly signed, wish to state that it does not amount to a row of pins, and you are not signing away your life, as you say. They have received enough complaints about you, and Kaiser, and I have been instructed several times to discharge both of you, which I did when I was in Phila., but as you have been subsequently reinstated, of course it has been necessary to have new instructions. Do you get me?"

But the plan of operation itself clearly shows that it was not intended nor expected that these instructions and notices would be complied with; else what possible purpose did the lead cards serve? Why did the principal defendants, at the expense of so much effort and money,

evolve this elaborate "lead" system, if it was to have no place in their enterprise? Why put the agent in possession of information regarding stale and admittedly uncollectible bankrupt claims of the intended victims unless representations concerning such claims were contemplated? Plainly the truth concerning such claims would have accomplished nothing. Of the significance of the "leads" Preeman wrote agent Millard:

"Up to three years ago we secured business in the same manner as other agencies do as we had no leads."

The conclusion is irresistible that the "leads" were devised as a basis for the false, but alluring, tales which this large company of trained agents with singular sameness related all over the country, to induce creditors of bankrupts to part with large sums in the hope of realizing on claims they had long regarded, as in fact they were, irretrievably lost. In the elaborate briefs and arguments no possible function for the "leads" is suggested, other than as the vehicle for the plausible presentation of gross untruths to further the mulcting of gullible business men. The very list plan and Wendler's letters acknowledging receipt of the lists, indicate that prior investigation of the list claims would be made to give a basis in each case for the terms of a contract which would be submitted; and when the contract was presented the victim was led to believe that investigation of the collectibility of the claims had in fact been made, and that it was this factor which entered largely ino the fixing of the amount of the realization charge stated in the contract, although in truth no investigation of any kind was ever made, or intended to be made. These instructions and warnings, therefore, far from exculpating the defendants, only fortify the conclusion that there was here a premeditated scheme of widespread and profitable deception.

[13] It is earnestly pressed upon us that, the contract being for services, proof of "an honest intent to render the service stated in the contract is wholly inconsistent with guilt." If by these flagrantly false representations of existing facts persons were induced to believe there would be speedy collection of certain of their hopeless claims, and were thereby inveigled into making substantial advance payments, will the fact that the recipient intends to do, and after securing the payment, actually does, all that can be done to make the collection (though well knowing that no effort would be availing), neutralize his culpability in the formulation of the fraudulent scheme to obtain the advance payment? Manifestly not. If it were otherwise, the most deliberate and circumstantial plan of deception to obtain in advance payment for services would be rescued from the charge of being in law "a scheme or artifice to defraud," if only there is present an intent to render service, which, as here, can avail the victim nothing.

The real and ultimate "service" contemplated as the result of the false representations was the collection of the old and delinquent uncollectible accounts. If the fact of intention to send letters in each case demanding payment of the listed claims will obviate the implication of the defendants "having devised a scheme or artifice to defraud," a more effective investment in envelopes, form letters, and postage

stamps could scarcely be imagined, nor a more cheap, simple, and efficacious instrumentality for deliverance from the toils of the law be conceived.

It is evident that the only thing intended to be done, or in fact done, towards collection, was the sending out of the form letters demanding payment, and then after a time, if the client manifested impatience at the delay in the realization of the promises and expected results, another letter or two, all at trifling cost, practically nothing compared with the payment made, the defendants all the time well knowing that neither such puny effort, nor any effort, could by any possibility bring any degree of success.

[14] We do not consider the three-year period provided in the contract as of any essential consequence. It would be serious, indeed, if persons could by fraudulent means secure advance payment upon a contract which had three years or more to run, and would thereby be immune from prosecution for the fraud for the period fixed in the contract. If the present payment of the realization charge was to be secured through the fraudulent scheme alleged, it is immaterial for how long or short a term the contract in which it was mentioned undertook to bind the parties, nor indeed whether the victim, after paying his money and signing the contract, did, or did not continue to comply with its terms. Besides, what of those many instances shown in the record where, in pursuance of the same fraudulent scheme, the schemers were not successful in procuring a contract to be signed, or, in securing the realization charge, notably those cases where the victim gave bank checks on which he succeeded in stopping payment, thus saving his money? In all such where the use of the mails was shown in attempted, though unsuccessful, execution of the scheme, section 215 was not less violated than in those where the scheme proved successful.

Defendants' counsel place much stress on the voluminous evidence of collections made and work done by the agency as bearing on the good faith of the defendants. It was testified that from 1901 to 1912 accounts collected by the agency amounted to about $650,000; that the agency had a list of lawyers all over the country to whom claims might be sent, and a force at St. Louis which made effort to collect every claim which came to the agency. As to the total of the collections in these 11 years (most of the time being before this "realization charge" scheme was conceived), it may be said that, where clients sent to the agency their current collections accruing after the contract was made, the ordinary results in the handling of such accounts, as might reasonably be expected, were achieved. Undoubtedly attempt was made to collect all such, particularly as regular collection commissions or fees were to be paid the agency for each collection, wholly aside from the "realization charge." But as to the stale accounts concerning which the untruths were put forth, it can make no material difference that it was really intended there should be sent out letters demanding payment, or that, if subsequently other accounts are sent in, effort will be made to collect them. The evidence discloses no rational purpose in sending out the letters about the stale bankrupt claims, except perhaps to provide some proof of good faith in the transaction in case

that was ever questioned. This may also be said of that part of the contract by which the agency obligated itself, without extra charge, to supply the client on request, printed forms of dunning letters to enable the client thenceforth to make his own collections without further expense, by employing this vari-colored literature of graduated degrees of persuasion and insistence. But even this contractually proposed generosity does not import into the transaction such substantial consideration to the victim as will obviate the conclusion that the evidence shows a scheme or artifice to defraud. Conceding the intention to give something in return for the money which it was fraudulently planned to secure—stationery for dunning letters, making demands upon debtors, attempts to collect new accounts, and the like—this is not inconsistent with having devised a scheme to defraud, as is contemplated by the act.

[15] In Bettman v. United States, 224 Fed. 819, 140 C. C. A. 265, it was well said:

"It is not necessary to criminality under the act that nothing whatever is to be given in return for the money."

The "minimum recovery" clause of the contract is urged as further indicating fairness of the transaction; it being contended that through it, if the collections made did not equal the minimum recovery stated in the contract (usually fixed at four times the realization charge), a certain amount would be returned to the client. From casual reading it might be concluded that such was the effect of the clause, but analysis and comparison with other parts of the paper shows it to be a mere collocation of words and phrases signifying nothing. Whatever right in this respect it seems to confer on the victim appears to be at the option of the agency, to refund, or to continue its service to the client for another year, the client, of course, receiving back none of the realization charge, and the agency continuing its "service" for yet another year, the client being bound for that additional time to send in all of its current delinquent accounts for collection at usual rates, to a concern whose operators had already fraudulently separated him from a substantial amount, under the guise of a "realization charge."

[16] 8. It is maintained that the evidence fails to show that any of the defendants except Wendler and Preeman used or caused to be used the mails, or that the use of the mails in execution of a scheme to defraud was shown to have been part of the alleged conspiracy. Under section 215 it is not essential that the use of the mails be contemplated by the fraudulent scheme. It may have been carefully designed to avoid using the mails altogether, but if in the execution of the scheme the mails are in fact used, the act is violated. Farmer v. United States, 223 Fed. 903, 139 C. C. A. 341.

[17] True it is that the evidence as to some of the defendants does not show them to have physically deposited in or taken from the mails any letters. But it is inconceivable that the scheme here charged and proved could have had vitality without using the mails. Preeman was at the Chicago office, Wendler at St. Louis, and the agents were in the field all over the country. Frequent communication was essential to progress and success. The material for the lead cards had to be gath-

ered from various parts of the land, and literature and supplies sent back and forth. The intended victims were in most cases large business concerns of the different cities of the land with whom much of the business must in the nature of things have been carried on by correspondence. Without the use of the mails the formulation and execution of the fraudulent scheme would have been an utter impossibility. It follows that all who participated in the scheme contemplated the use of the mails in the execution of their common design; and when to this end Preeman and Wendler made use of the mails it was not only on their own behalf, but as well on behalf of their coparticipants, and their acts in this regard became the acts of each of them. This is not less true where the prosecution is under section 215 than under the charge of conspiracy. Fitzpatrick v. United States, 178 U. S. 304, 20 Sup. Ct. 944, 44 L. Ed. 1078; Belden v. United States, 223 Fed. 726, 139 C. C. A. 256.

[18] And as to the conspiracy, the evidence showing, as it does, that it was to be executed, and that in its execution the use of the mails was indispensable, the intent to use the mails as a part of the conspiracy is thereby sufficiently shown. Farmer v. United States, supra. In Wilson v. United States, 190 Fed. 430, 111 C. C. A. 231, in affirming conviction under an indictment containing counts for misuse of the mails and for conspiracy to misuse the mails, it was said:

"They could accomplish their objects only through the use of the mails and through the use of the mails has come this condemnation under a federal statute."

[19] 9. Error is claimed to have intervened in the admission of evidence as to the bankruptcy of certain persons, the claims against whom are charged to have been a subject-matter of the fraudulent scheme. No impropriety is asserted in showing that such persons were adjudicated bankrupt, but the errors claimed are that in the instrument of evidence showing them to have been adjudicated bankrupt in some instances it appeared also that they had been discharged from bankruptcy, and the contention is that it was improper to show the discharge. Even if this were incompetent to be shown, we do not understand how the evidence could in any manner have harmed defendants. But we believe it was competent as bearing on the collectibility of the accounts against the bankrupts, and as thus throwing light on the intent and good faith of the defendants in representing they could and would collect such claims.

10. Complaint is made that the court did not charge the jury in accordance with certain requests for charges made on behalf of the defendants. In so far as such requests are not covered by the charge which the court gave, they refer to the contract and its asserted influence on the issues herein as contended for on behalf of defendants. This we have already considered in dealing with that subject, and it need not be further discussed in this connection. The charge which the court gave was not objected to, but we find no material error in it, neither in what it includes, nor in what it fails to include, it being particularly urged by counsel (though no such objection was made at the time) that the charge did not sufficiently present the case to the jury.

[20] 11. In support of the earnest contention that through conviction

on the conspiracy counts as well as on the others there is a double conviction, it is said that in each of the conspiracy counts there is set forth as the overt acts the mailing of certain letters, which letters are also stated in some of the other counts as letters mailed in violation of section 215; the proof showing such letters to be in fact the same. Under the facts here, the case of Ryan v. United States, 216 Fed. 13, 132 C. C. A. 257, decided by this court, is controlling upon this contention. There the indictment joined counts charging defendants with the consummated act of aiding and abetting in carrying explosives on passenger trains with counts for conspiracy to so transport explosives. Overt acts were charged, apart from the actual transportation of the explosives, and the court, speaking by Judge Seaman, said:

"Thus the counts for conspiracy, on the one hand, and those for aiding and abetting unlawful carriage of explosives, on the other hand, cannot rightly be defined as 'interdependent,' nor were both charges either proved or provable by the same evidence, as contended; and the further contention that commission of the offenses averred in the last-mentioned counts was relied upon and involved for conviction under the conspiracy counts is unsupported by the averments in such counts, wherein neither of such commissions of offense is set forth in the specification of overt acts, so that no question arises whether their averment therein as overt acts would affect the rule above stated as to the independent nature of the other counts. Undoubtedly the evidence introduced in support of the conspiracy charge may well serve as evidence tending to support the charges of aiding and abetting commission of the offenses averred in the other counts; but this coincidence in part gives no support to either contention of identity of the offenses charged, or of identity of the evidence involved for conviction. It is obvious that proof to convict of commission of the unlawful carriages, as aiders and abettors, must extend beyond the requirements for proof of the conspiracy."

The situation there does not differ materially from what here appears. Here, as there, is found the coincidental fact that the evidence to prove the scheme to defraud serves also as evidence tending to support the conspiracy charge. Under section 215 an actual use of the mails is essential to conviction. Under section 37 the overt act to complete the offense may be any act. It may be mailing a letter or anything else. If the act charged and proved as the only overt act under section 37 were the mailing of a letter, and the same letter only was charged and proved as the letter mailed in execution of a scheme to defraud alleged under section 215, it may well be that the mailing of the one letter, completing as it would an offense under section 37, and at the same time an offense under section 215, would not admit of the defendant's conviction and punishment under more than one charge, so proved; and such state of facts would well justify the doubts expressed by Judge Denison in the recent case of Hendrey v. United States, 233 Fed. 5, 147 C. C. A. 75.

But that is not the situation with which we are dealing. The conspiracy counts do set forth as overt acts the mailing of letters, some of which appear in counts under section 215; yet each of the conspiracy counts set forth as overt acts the mailing of letters not set out in the counts under section 215 as the letters mailed in execution of the scheme. Counts 25 and 26 further charge as overt acts, other things, such as procuring lists, sending out lead cards, and meeting together, or of mailing letters other than letters charged and proved as complet-

ing offenses under section 215, the proof of which established the conspiracy charged, as an offense separate from those charged and proved under section 215. Applying the rule laid down in the Ryan Case, it follows there was here no double conviction.

While we have confined our discussion to those contentions we deemed most important, we have given consideration to all the points raised, and from a perusal of the record and study of the extended briefs and the arguments, oral, printed and written, we conclude no error appears which would justify disturbance of judgment as to any of the defendants.

Judgments affirmed.